**Dominic STEWART, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 95–CF–125.**

District of Columbia Court of Appeals.

Argued Nov. 25, 1996.

Decided Dec. 23, 1996.

Claire T. Roth, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Eileen F. Sheehan, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, and Elizabeth Trosman, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and STEADMAN and SCHWELB, Associate Judges.

WAGNER, Chief Judge:

Appellant, Dominic Stewart, shot and killed Trent Walker following a gun battle which started in Maryland and ended in an alley in Southeast Washington, D.C. Stewart

---

contended that he shot Walker in self-defense. Stewart was indicted for first-degree murder while armed (D.C.Code §§ 22–2401 and –3202 (1996)), assault with intent to kill while armed (D.C.Code §§ 22–501 and –3202 (1996)), possession of a firearm during a crime of violence (D.C.Code § 22–3204(b) (1996)), and carrying a pistol without a license (D.C.Code § 22–3204(a) (1996)). Stewart was tried by a jury which was unable to reach a verdict on the count of first-degree murder while armed. The jury found Stewart guilty of the lesser-included offense of second-degree murder while armed and both weapons offenses, but not guilty of assault with intent to kill. Stewart argues for reversal on the ground that the trial court abused its discretion in failing to instruct the jury that mere possession of a firearm, although a crime, does not defeat a claim of self-defense. We conclude that the trial court's instructions read as a whole, adequately explained the legal principles governing Stewart's self-defense claim.

## I.

According to witnesses for the government, on May 26, 1994, there was a gunbattle near Branch Avenue and Colesbrook Road between men in a gold Nissan 300 ZX in which Trent Walker, the victim, was a passenger, along with two or three others, and a gray or white vehicle and a black BMW or Mercedes Benz. After the gunfire ceased, a witness at that location looked up and the cars were gone.

Another witness, Mr. Brown, testified that later he saw two 19 to 20 year old black men get out of a black BMW on Pennsylvania Avenue at the Fairfax Village Apartment complex in Southeast Washington, D.C. According to Brown, the two gunmen ran across the street and into an alley and started shooting, as if they were "at a firing range." After the gunfire ceased, Brown said he saw one of the gunmen, who was wearing clothes like those worn by Stewart that night, come out of the alley holding himself as if he was wounded in the buttocks or leg. Brown observed the injured man enter a blue vehicle. Brown's testimony was corroborated by another witness, Mr. John-son. According to Johnson, he saw a man wearing clothes consistent with those worn by Stewart first running into the alley firing a gun, and then limping out of the alley and placing a gun in his pants.

An off-duty police officer, Michael Pratt, testified that on the night that Walker was killed, he was driving on Southern Avenue with his wife and son when he heard gunshots. Pratt, who was in plainclothes, told his wife to call the police before he entered the alley to investigate. Once in the alley, Officer Pratt saw Walker holding a gun and another black male at the other end of the alley. The men were headed in opposite directions. Officer Pratt identified himself, but Walker ran toward Pratt and fired in his direction. Pratt returned the fire, hitting Walker in the leg and torso. Walker fell to the ground, attempted to fire again, but he finally ceased moving.

Someone yelled to Officer Pratt to watch out for the other person with a gun, and Pratt looked away from Walker momentarily. When the officer turned back toward Walker, Pratt saw Stewart "running" and "creeping" up on Walker before shooting Walker in the back of the head two or three times, at close range. According to Pratt, Walker did not point his gun at Stewart before he was killed, and Stewart shot Walker as he lay helpless on the ground. Stewart then picked up Walker's gun and fired at Pratt. Pratt returned the gunfire, shooting Stewart in the buttocks as he fled from the scene. Another witness, Ms. Davis, testified that she saw Stewart shoot Walker in the head without hesitation.

When Stewart reached Pennsylvania Avenue, he stopped Kisha Rollins and Deborah Hylton, who were driving by, told them that he had been shot, and they took him to the hospital. Rollins gave Stewart a shopping bag on which to sit in an effort to protect the car seat from blood stains. However, Stewart placed his gun in the bag. Later, the police recovered the weapon, a 9mm Beretta, from the vehicle when the driver gave them permission to search it at the hospital. An additional magazine from the gun fell out of Stewart's clothing at the hospital as he undressed before treatment. Ballistics evi-

dence showed that the bullets recovered from Walker's neck and head were fired from Stewart's Beretta.

Stewart testified that he was a passenger in a white *Mercury stationwagon* that night, which was driven by a friend, Dewarrion Myer. Myer testified that earlier that evening, he almost ran into a group of young men on the parking lot at the mall, and two of the three young men displayed guns. Shortly thereafter, he saw the same young men in a Nissan 300 ZX, and the driver and a passenger fired at Stewart and Myer. About that time, according to Myer, a black BMW pulled up behind them, and he and Stewart ducked, but they did not return the fire.

Stewart admitted carrying a gun that night for protection, but he said that he did not fire back at the men in the ZX because he did not want trouble. According to Stewart, they pulled the car over near the Fairfax Village Apartments because their tire was becoming flat. Stewart testified that while looking at the tire, the ZX pulled up, Walker got out of the ZX, and the shooting started as Stewart crossed Southern Avenue. Frightened, Stewart ran, but he met up with Walker again in the alleyway, where they shot at each other and fled in different directions. Stewart testified that he kept running until he saw Walker again, lying on the ground. Stewart said that he approached Walker only because it appeared that Walker was dead. According to Stewart, Walker raised up his gun with both hands as if to shoot him, and he shot at Walker in self-defense. Stewart admitted picking up Walker's gun and firing wildly.

## II.

During discussions of closing instructions, Stewart's attorney requested the court to instruct the jury that an accused "does not lose his right to claim self-defense merely because he had a pistol that day, or because he was carrying a pistol beforehand." The prosecutor objected, and the court stated that the instruction was inappropriate. Defense counsel pressed the point, explaining that the instruction was required to preclude the prosecutor from arguing incorrectly that

Stewart, who was carrying a pistol that day, loses his right to claim self-defense. The prosecutor disclaimed any intention of making such an argument, and the trial court stated that the prosecutor could not claim as a matter of law that possession of a pistol forecloses a self-defense claim. However, the court stated that the prosecutor could point out the evidence that Stewart was carrying a pistol that night. The trial court did not permit counsel to make further argument in support of the requested instruction and denied the request.

Stewart argues for reversal on the ground that the trial court abused its discretion in refusing to instruct the jury that the unlawful possession of a handgun does not defeat a claim of self-defense. He contends that the instruction was required to prevent the jury from deciding the case applying an incorrect legal standard. It is Stewart's position that the jury cannot be expected to know, absent instruction, that one who unlawfully carries a gun may have a valid claim of self-defense. The government does not challenge that the mere unlawful possession of a gun does not defeat a claim of self-defense. However, it contends that the trial court did not abuse its discretion in refusing the requested instruction and that Stewart was not prejudiced by its omission.

This court has stated that " '[i]f the instructions given correctly cover the case, no error is committed regardless of the fact that other refused instructions may also contain proper statements of law.'" *Hicks v. United States,* 658 A.2d 200, 202 (D.C.1995) (quoting EDWARD J. DEVITT, ET AL., FEDERAL JURY PRACTICE & INSTRUCTIONS, § 7.05, at 236–37 (4th ed.1992) (other citations omitted). Thus, the trial court's failure to give a requested instruction is not reversible error where the instructions given properly inform the jury of the applicable legal principles involved. *Christian v. United States,* 394 A.2d 1, 49 (D.C.1978), *cert. denied,* 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979).

The government argues that the instructions given by the trial court adequately informed the jury of the legal principles gov-

erning Stewart's self-defense claim. In the course of its instructions, the trial court instructed the jury at least five times that a person has a right to use a reasonable amount of force in self-defense, including deadly force. In the context of this case, the only deadly force to which the court could have been referring was the firing of the pistol. The trial court gave standard jury instructions, Nos. 5.12 and 5.13, from the CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, (4th ed. 1983) (Redbook).[1] The court also instructed the jury that:

> [L]astly with regard to self-defense, there has been testimony both that the complainant was the aggressor and the defendant was the aggressor.

> You must first determine from the evidence whether in fact, the defendant was the aggressor.

> If you find that the defendant was the aggressor, or if he provoked the conflict upon himself, he cannot rely upon the right of self-defense to justify his use of force.

> One who deliberately puts himself in a position where he has reason to believe that his presence will provoke trouble, cannot claim self-defense.

> Mere words without more by the defendant do not constitute provocation or aggression.

Stewart contends that the instructions left the jury to speculate about whether he pro-voked the attack because he approached Walker while carrying a pistol unlawfully. The government concedes that the mere unlawful possession of a firearm without more does not preclude a self-defense claim. However, it contends that Stewart's right to use the weapon in self-defense was implicit in the court's instructions and that Stewart was free to make the argument to the jury.

The instruction which Stewart requested, as the government acknowledges, is not an inaccurate statement of the law. *See Cooke v. United States,* 107 U.S.App. D.C. 223, 224, 275 F.2d 887, 888 (D.C.Cir.1960); *Wilson v. United States,* 91 U.S.App. D.C. 135, 136, 198 F.2d 299, 300 (D.C.Cir.1952); *Townley v. State,* 355 P.2d 420, 440 (Okl.Cr.1959); *see also Hurt v. United States,* 337 A.2d 215, 217 (D.C.1975). Moreover, it may have made clearer the law applicable to Stewart's theory of defense. However, the court's failure to give the instruction "is not reversible error if the instructions actually given inform[s] the jury of the applicable legal principles." *Christian, supra,* 394 A.2d at 49.

■ Here, the instructions covered Stewart's legal theory and left him free to argue that he shot Walker and fired at Officer Pratt in self-defense. The instructions did not suggest that Stewart could not use the weapon in self-defense if the jury found that he possessed it unlawfully. It included no restriction that unlawful possession of the

---

1. Instruction No. 5.12 reads in pertinent part as follows:

Every person has the right to use a reasonable amount of force in self-defense if (1) he actually believes he is in imminent danger of bodily harm and if (2) he has reasonable grounds for that belief. The question is not whether looking back on the incident you believe that the use of force was necessary. The question is whether the defendant, under the circumstances as they appeared to him at the time of the incident, actually believed he was in imminent danger of bodily harm and could reasonably hold that belief.

The defendant is not required to prove that he acted in self-defense.

Where evidence of self-defense is present, the government must prove beyond a reasonable doubt that the defendant did not act in self-defense. If the government has failed to do so, you must find the defendant not guilty.

Portions of standard instruction 5.13 were given by the trial court in the following way:

A person may use a reasonable amount of force in self-defense, including, in some circumstances, deadly force, which is force that [is] likely to cause death or serious[ ] bodily harm.

A person can use deadly force in self-defense if he actually and reasonably believes at the time of the incident that he is in imminent danger of death or serious bodily harm from which he can save himself only by using deadly force against his assailant.

\* \* \* \* \* \*

If a defendant actually and reasonably believes that he is in imminent danger of death or serious bodily harm, and that deadly force is necessary to repel such danger, he may use deadly force in self-defense.

He may do so, even though afterwards, it turns out that the appearances were false because either the defendant was not actually in imminent danger, or deadly force was not necessary.

weapon precluded one who uses it from claiming self-defense. Moreover, the court instructed the jury, at least five times, that a person has the right to use a reasonable amount of force in self-defense, including deadly force. The court instructed the jury that

> Mr. Stewart may not be convicted of—of any degree of murder, or manslaughter, or assault with intent to kill ... or possession of a firearm during [the] commission of a crime of violence ... unless you find that the [g]overnment has proven that he did not act in self-defense.

The instructions, taken as a whole, clearly convey that Stewart, who concededly carried a weapon that day, had the right to use it in self-defense as the court instructed the jury.

Stewart relies upon several cases from other jurisdictions to support his position. The cases are distinguishable. In one case, the Idaho court of appeals reversed a defendant's conviction where the trial court failed to instruct a deliberating jury, in response to a note, that a person may lawfully defend himself even if he uses a weapon which he possesses unlawfully. *State v. Pinkney,* 115 Idaho 1152, 772 P.2d 1246, 1248 (Ct.App. 1989). Pinkney shot the complaining witness during a confrontation in an alley, and he was charged with aggravated battery. The jury, which learned of Pinkney's prior felony convictions as impeachment evidence, apparently speculated that his possession of the pistol was unlawful even though Pinkney was not charged with a weapon offense. During deliberations, the jury sent a note inquiring whether the possession of a firearm would negate self-defense as to the included offenses. In response to the question, the trial court referred the jury to the self-defense instructions previously given. In reversing the conviction, the Idaho court stated that the self-defense instructions given did not address the "effect, if any, that unlawful possession of a firearm might have on self-defense. Consequently, the trial court had the duty to further instruct on this point." *Id.,* 772 P.2d at 1248. The reason that the appellate court found that the trial court abused its discretion in *Pinkney* was because of its obligation to give additional instruc-

tions where the jury evidences confusion on a point of law.

The case before this court is distinguishable from *Pinkney.* Here, there is no evidence that the jury did not understand that the self-defense issue was not affected by Stewart's possession of a gun. Unlike the jury in *Pinkney,* the jury in Stewart's case asked the court to restate the self-defense instructions only. The jury's request does not indicate any uncertainty about the weapons issue or the type of misconception expressed by the jury in *Pinkney.*

Stewart also relies upon the case of *Wilson v. State,* 171 So.2d 903 (Fla.App.1965). In *Wilson,* the defendant admitted fatally shooting the victim, but he claimed that he did so in self-defense. He was charged with second-degree murder, but not with carrying the pistol unlawfully. After explaining the limitations on the right of self-defense, the trial court immediately stated that the law prohibited carrying a pistol without a license, and that although the defendant was not charged with that offense, it "is a circumstance, however, that you as jurors may consider as one of the circumstances of the case." The Florida court determined that the instruction was reversible error for two reasons: (1) the language used and its placement in the instruction made it capable of suggesting that Wilson's illegal possession of the gun meant that he was not free of guilt, and therefore was precluded from claiming self-defense and (2) the instruction suggested impermissibly that he was guilty of another crime. *Wilson,* 171 So.2d at 904.

Stewart contends that the danger of an improper inference was greater in his case because he admitted that he possessed the weapon illegally. We disagree. The instructions in Stewart's case were not structured in a way that would mislead the jury to conclude that self-defense was not available because he was charged with carrying a pistol without a license. On the contrary, the court specifically instructed that self-defense was a defense to each of the crimes charged except for carrying a pistol without a license. In addition, the impermissible admission of other crimes evidence, which formed one of the

grounds for reversal in *Wilson,* was not present here.

Stewart also relies upon *Cauley v. State,* 260 Ga. 324, 393 S.E.2d 246 (1990). Cauley claimed that the trial court erred in failing to instruct the jury that one who is committing the offense of possession of a firearm after conviction of a felony may nevertheless use force in self-defense. *Id.,* 393 S.E.2d at 248. The Georgia court determined simply that the trial court's instruction was sufficient and consistent with Cauley's theory that use of a pistol, acquired suddenly, in self-defense would not violate the law prohibiting a felon from possessing a firearm. That court established no rule that the jury must be instructed not to consider that the accused possessed a pistol unlawfully in determining whether he acted in self-defense.

In this case, we are satisfied that there was no risk that jurors would conclude that they must reject Stewart's self-defense claim merely because he admitted carrying a pistol unlawfully. Defense counsel was free to argue, and did argue, that Stewart had a right to defend himself with the gun. The instructions given adequately informed the jury of the controlling legal principles. *See Christian, supra,* 394 A.2d at 48. Therefore, we find no reversible error.

For the foregoing reasons, the judgment appealed from hereby is

*Affirmed.*