Dissenting opinion by Associate Judge Beckwith at page 248.
Thompson, Associate Judge:
Following a four-day jury trial, appellant was convicted of assault with intent to kill while armed ("AWIKWA") (firearm), two counts of possession of a firearm during a crime of violence ("PFCV"), aggravated assault while armed ("AAWA") (firearm), possession of an unregistered *234 firearm ("UF") and unlawful possession of ammunition ("UA"). Appellant asks this court to reverse all of his convictions, contending that the trial court reversibly erred by employing a husher during the voir dire of prospective jurors, in admitting a photo array containing mugshots even though identity of the shooter was not an issue, in not intervening when the prosecutor made certain remarks during the government's closing argument, and in giving a jury instruction on provocation. For the reasons that follow, we affirm.
I.
The charges against appellant were based on an incident that occurred in the early morning hours of February 2, 2014, outside of Look Lounge, near the intersection of 20th and K Street, N.W. Johnny Campbell testified that he was leaving the Look Lounge nightclub around 2:40 a.m. on that morning with his friends Jeremy Paige and "Rob" and was turning right to walk to his car when he ran into Areka Mitchell, with whom he had gone to high school. Campbell greeted Mitchell, and Mitchell introduced appellant to Campbell as her fiancé. Campbell testified that appellant then said in an "angry" voice, "Who the fuck are you?" and "something like" "What are you all, like school buddies or study buddies?" Campbell and appellant were "in each other's face," and appellant then struck Campbell in the face.
Campbell testified that he hit appellant back and they began fighting.[1] Appellant was on the ground when Campbell "felt a blow to [his] head," which "stunned [him]," and then felt a second blow to his head, which "shook [him] up" and "made [him] get up off of [appellant]." Campbell then heard appellant say either "I'm going to get my shit" or "[w]here's my shit," words that Campbell understood to mean that appellant was "going to get [his] gun." Campbell also heard Mitchell say, "[h]e's getting ready to bust your ass," which Campbell understood to mean that he was "about to get shot." Campbell testified that he ran diagonally across 20th Street, eventually turning left onto L Street. As he was running across 20th Street, he heard gun shots, causing him to "r[u]n even faster," and he saw "[appellant] with [his] car door open ... [and] fire coming from the gun" in appellant's hand. At some point, Campbell became aware of "a hole in [his] back" and that he "couldn't lift [his] arm up." He eventually ran into a nearby Exxon station where an ambulance was called and took him to a hospital.[2]
Paige, Campbell's friend since childhood, testified that he and Campbell were walking to Campbell's car when appellant called out to Campbell and got "in [Campbell's] face." Paige testified that appellant pushed Campbell in the chest, that Campbell responded by hitting appellant in the face, and that the two men "got to grappling with each other."[3] Appellant then fell over a planter, and Campbell "punch[ed] [appellant] against [appellant's] car." That was when Mitchell began hitting Campbell in the back of his head with her high-heeled shoe. After this, appellant and Campbell both got up and the fight continued in the middle of 20th Street, at which time Paige was "trying to guide [Mitchell]
*235 from hitting [Campbell] in the back of the head." Paige testified that Campbell then "caught [appellant] with two or three good shots," and appellant fell to the ground. Campbell went directly "across the street from [appellant's] car," and Mitchell "followed [Campbell], screaming." Paige "thought the fight was over," but then saw appellant, who had a gun in his hand, "reach[ ] in[to] the back seat" of his car (which the testimony indicated was parked on 20th Street between K and L Street), "load[ ] the magazine into the gun," and "start[ ] shooting." Paige testified that "it seemed like [appellant shot] probably seven to eight bullets" but that "[i]t could be more." Paige testified that no one was physically hitting appellant at the point when appellant started shooting and that there was no one near appellant who was a physical threat to appellant at that time. Paige denied hitting, punching, or kicking appellant or otherwise participating in the fight and testified that none of the friends who had been with him and Campbell at the club was participating or even standing around during the fight.
Metropolitan Police Department ("MPD") Officer James Burgess, who was with the MPD Crime Scene Investigations Division, collected evidence from the scene of the shooting, including nine cartridge casings, one bullet fragment, and two bullets. The cartridge casings were all found on 20th Street. Officer Burgess testified that one of the bullets was found inside a newspaper box on L Street, near the corner of 20th and L Street, and that the other bullet was found a little further west on L Street.
Daniel Barrett, a firearms and toolmark examiner with the Department of Forensic Science, testified that all nine cartridge casings were the same caliber and from the same manufacturer and had the same caliber and manufacturer as casings recovered from inside a semiautomatic firearm found in appellant's residence. Mr. Barrett further testified that "shell casing[s] ... eject to [the shooter's] right side" and "bounce when [they] hit[ ] the cement." Looking at Government Exhibit 40, which depicted where the shell casings were found on 20th Street, Mr. Barrett testified that the locations were "indicative of [the shooter] being off to the left and walking in a straight line," up 20th Street toward L Street.
Dr. Bruce Abell, the trauma surgeon who attended to Campbell on the morning of the incident, testified that Campbell presented with abrasions to his lip and face, swelling that was "consistent with someone being punched," and "a small laceration" on his scalp, which was "consistent with hitting something or being hit by something." Dr. Abell further testified that a bullet pierced and then left Campbell's body and that there was a wound in his left shoulder and on his back. Dr. Abell could not tell which of the wounds was an entrance wound and which was an exit wound. He opined, however, that the wounds were consistent with Campbell's "facing away from the shooter, but to an angle" and were "not consistent with [Campbell's] facing a shooter." Dr. Abell also noted that "with short range gunshots, ... you can actually see some changes on the skin at the entrance wound, ... [i.e.,] stippling," which Dr. Abell did not see on Campbell.
Dr. William Bruchey, an expert in firearms examination, ballistics, and crime scene reconstruction, testified in the defense's case that there is a "randomness to the shell casing pattern" of a semiautomatic pistol. Based on where the shell casings were found on 20th Street, Dr. Bruchey opined that the shooter was "relatively stationary" rather than walking. Asked on cross-examination how he accounted for *236 the bullet "recovered further left on L Street," Dr. Bruchey said that a newsstand when hit by a bullet "can make [the bullet] take a left turn."
Appellant testified that after leaving Look Lounge on the early morning in question, he went to retrieve his car, with the intent of pulling it in front of the club to pick up his fiancée, Mitchell. The valet parking obstructed appellant from doing this, so he turned right onto 20th Street and found an open parking spot immediately upon turning. After parking, he reached into his glove compartment and retrieved his loaded gun and put it on his hip "for protection" because he had been shot about two months previously after leaving a club. The bullet from that shooting had gone through his arm and into his chest and remained lodged there at the time of the trial.
Appellant testified that he went to the front of the club and found Mitchell and was walking back to his car with her when they encountered a group of three guys who "were being loud[and] belligerent." One was Campbell, and appellant testified that Campbell "grabbed [Mitchell] by the hips and pulled her close" and, when Mitchell "pushed his hand off her," "kept on approaching, [and being] aggressive toward her." Appellant then grabbed Campbell's shoulders, and turned him around, and the two of them "had verbal words." During this time, appellant testified, Mitchell was pulling appellant away "because she ... didn't want the argument to escalate" and walking towards the car. When appellant reached the driver-side door but before he could get into the car, Campbell "ran up" and punched him in the face. Campbell and appellant started fighting, and Paige "ran over and ... started ... swinging at [appellant]," "hitting [him] on top of [his] head," and it became "like a moving brawl." Appellant testified that he heard Rob say "move back, let me stab him." Appellant then "pushed off as hard as [he] could" from the two others and reached for his gun and "pulled the trigger[ ] as fast as [he] could," afraid that one of the men would try to take the gun from him. Appellant testified that he was concerned about "what would happen to ... [the] bullet in [his] chest" if he was hit the wrong way, that his intent was "to just get them off of me" and "stop them from jumping me," and that it was not his intent to kill Campbell. Appellant told the jury that he was "disoriented from getting hit" in the head and could not "see straight" because he had blood in his face and eyes, but stopped shooting after he "started to come to and started to see clearly" and noticed that "the threat wasn't there" and the other men were not in front of him. Appellant acknowledged that he fired nine shots but said that he did not think he hit anyone and therefore just returned home after the shooting.
The jury received a verdict form that instructed jurors to consider whether appellant was guilty of the lesser-included offense of assault with a dangerous weapon (firearm) if they acquitted appellant of the AWIKWA (firearm) charge. The jury found appellant not guilty of AWIKWA (automobile), assault with a dangerous weapon (automobile), and AAWA (automobile). This appeal followed.
II.
We turn first to the issue appellant raised for the first time in a supplemental brief, which this court granted him leave to file. In seeking permission from the court to file the supplemental brief, counsel explained that it had come to her attention that she "failed to raise a preserved issue of constitutional importance in [a]ppellant's opening brief: the denial of [appellant's] right to a public trial during jury selection,"
*237 an issue that counsel said was "essential to raise ... on appeal in order to provide effective assistance to [appellant]." The government did not oppose appellant's motion to file a supplemental brief, but asserts in a footnote to its supplemental opposition brief that the court could treat the claim raised in the supplemental brief as waived, as this court typically does with arguments raised for the first time in a reply brief or during oral argument. Given counsel's commendable candor and the importance of effective assistance of counsel, we elect to consider the "public-trial" issue raised in the supplemental brief.
The record shows that the court posed voir dire questions to prospective jurors in open court and, thereafter, questioned individual jurors about their responses at the bench, with the husher turned on to prevent everyone except the court, the attorneys, appellant, and the court reporter from hearing the exchanges that followed.[4] As the court described the procedure, it entailed "doing the examination up at the bench and leaving seats in the back of the courtroom for the public and authorizing access to the proceedings as appropriate or where requests are made." Appellant's contention in his supplemental brief is that the trial court violated his constitutional right to a public trial by conducting individual-juror voir dire at the bench with the husher turned on, an arrangement that prevented the public from hearing the exchanges that occurred. Appellant asserts that the trial court failed to make the findings required by Waller v. Georgia , 467 U.S. 39, 48, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) ("[T]he party seeking to close the [courtroom] must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.").[5] Appellant asserts that in the absence of such findings, use of the husher to preclude the public from hearing the voir dire exchanges at the bench was structural error, entitling him to reversal of his convictions without a required showing of prejudice or harm (and, accordingly, appellant has not attempted to show prejudice from use of the husher).
In raising the public-trial issue in the trial court, appellant asserted that there was no "compelling interest to exclude the public" and that conducting the jury selection process "with the husher on albeit with ... seats in the back of the courtroom open ... to people to sit in on a husher," i.e., "where the matters can be seen but not heard," was "not consistent with what the Constitution envisioned as being an open trial." The trial judge acknowledged that the public and the press "have a right to participate" and a "right to get every syllable of th[e] conversations" that occur at the bench during voir dire , a right the court reasoned, however, "can get effectuated in different ways." In denying appellant's request to proceed without the husher, the trial judge cited his concern about "the candor of prospective jurors," which he said was "[b]ased on 20 years of being a trial lawyer and more *238 than 10 years of being a [j]udge." The judge explained that it was his "experience and belief that [potential jurors] are less forthcoming in response especially to sensitive questions when they don't have, at least, the cover of the husher and being up at the bench."
The Sixth Amendment to the United States Constitution provides in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a ... public trial ...." U.S. Const. amend. VI. The Supreme Court has recognized that the guarantee of a public trial extends to the voir dire examination of potential jurors. Press-Enterprise Co. v. Superior Court , 464 U.S. 501, 504-10, 104 S.Ct. 819, 78 L.Ed.2d 629, (1984) (considering the issue under the First Amendment); Presley v. Georgia , 558 U.S. 209, 213, 130 S.Ct. 721, 175 L.Ed.2d 675 (2010) ("[T]here is no legitimate reason, at least in the context of juror selection proceedings, to give one who asserts a First Amendment privilege greater rights to insist on public proceedings than the accused has [under the Sixth Amendment]."). As this court has observed, "it is only under the most exceptional circumstances that limited portions of a criminal trial may be closed even partially to the public." Kleinbart v. United States , 388 A.2d 878, 883 (D.C. 1978). We held in Kleinbart that "[w]here the trial court has improperly excluded the public or a portion thereof from the courtroom during a criminal trial, and the accused has made timely objection to such exclusion, prejudice will be presumed without placing the burden upon the accused to show actual harm to justify reversal." Id. at 882 (reversing Kleinbart's conviction because, during the testimony phase of his trial, "the courtroom was locked upon order of the trial court," which thereby "closed [the] trial to all the public for a portion of at least one day" "for no articulated reason ," id. at 879, 881, 883 (emphasis in the original) ).
The government argues that appellant's claim that he is entitled to reversal of his convictions without any showing of actual harm is foreclosed by this court's holding in Copeland v. United States , 111 A.3d 627 (D.C. 2015) : "We hold that the long-standing practice in this jurisdiction of conducting individual voir dire at the bench, within the view but outside the hearing of the public, is not a structural error." Id. at 634-35. Appellant discounts that explicit "hold[ing]," asserting that it was not "needed to resolve Copeland's ineffective assistance [of counsel] claim [that was premised on counsel's failure to inform Copeland of his right to be present at the bench during the voir dire of individual jurors]" and thus was dictum , and arguing in addition that the "hold[ing]" announced in Copeland is inconsistent with this court's holding in In re Access to Jury Questionnaires , 37 A.3d 879 (D.C. 2012).
Even assuming arguendo that the pertinent "hold[ing]" in Copeland was dictum , we reach the same conclusion here, for the reasons the Copeland court articulated and others. As we said in Copeland , "[w]hen questioning occurs at the bench, the public can still observe the proceedings," thus "further[ing] the values that the public trial right is designed to protect," and can "hear the general questions posed to the jury panel." 111 A.3d at 634 (internal quotation marks omitted). We emphasized that when the husher is used during individual voir dire questioning at the bench, "[t]he courtroom [i]s not closed, no one [i]s excluded from observing voir dire , and a transcript of the proceeding is available." Id. at 633. We explained that the husher procedure is "designed, in part, to protect a juror's privacy and to encourage potential jurors to be forthright when they might otherwise be reluctant to discuss *239 personal experiences or private matters" and also "to prevent a potential juror's answers to voir dire questions from prejudicing other members of the venire." Id. at 634.[6]
In general, courts have found there to be full or partial courtroom closures only where some or all members of the public are precluded from perceiving contemporaneously what is transpiring in the courtroom, because they can neither see nor hear what is going on. For example, in Presley , 558 U.S. 209, 130 S.Ct. 721, the Court held that the defendant's right to a public trial was violated when the trial court excluded the public, including the defendant's uncle, from the courtroom during voir dire of prospective jurors, to prevent jurors from overhearing some inadvertent comment or conversation. Id. at 213, 130 S.Ct. 721. In Cable News Network, Inc. v. United States , 824 F.2d 1046 (D.C. Cir. 1987), the D.C. Circuit summarily reversed the district court's determination "that voir dire examinations would be conducted in camera save for any prospective jurors who elected to be questioned in open court." Id. at 1047. The D.C. Circuit did not state precisely what it meant by "in camera ," but Black's Law Dictionary defines "in camera " as meaning either "[i]n the judge's private chambers" or "[i]n the courtroom with all spectators excluded." (10th ed., West 2009 at 878). Thus, we read Cable News as holding that the public-trial right is violated when individual-juror voir dire is held in the judge's chambers or elsewhere in a place from which the public is excluded. Similarly, in ABC, Inc. v. Stewart , 360 F.3d 90, 95 (2d Cir. 2004), the court found an erroneous closure of the voir dire proceedings where examinations of prospective jurors were conducted in the judge's robing room. Decisions of this court rendered upon plain-error review have reached a similar result. See ( Antonio ) Williams v. United States , 51 A.3d 1273, 1283 (D.C. 2012) (finding obvious error where the voir dire of individual jurors was moved to a jury room, from which spectators were excluded, to accommodate the visually impaired prosecutor); see also Barrows , 15 A.3d at 679 (finding obvious error where the trial court excluded members of the public from the courtroom during the time it took to conduct voir dire , in order to accommodate the large number of potential jurors in the venire).
By contrast, where proceedings are conducted in the open courtroom but with some members of the public having an obstructed view, courts have generally concluded that the process is an alternative to closure rather than a closure subject to the requirements of Waller . See, e.g. , Rodriguez v. Miller , 537 F.3d 102, 103-10 (2d Cir. 2008) (holding, upon reconsideration of an earlier ruling at Supreme Court direction, that the trial court's requirement that defendant's family members sit behind a screen to shield a testifying undercover police officer from their view or otherwise *240 be excluded from the courtroom during the officer's testimony did not violate clearly established federal law and was at least arguably a "reasonable alternative to closure" of the courtroom to the family members, rather than a partial closure);[7] Pearson v. James , 105 F.3d 828, 830 (2d Cir. 1997) (characterizing the placing of a screen between spectators and a testifying undercover officer as an "alternative[ ] to closure"); United States v. Lucas , 932 F.2d 1210, 1217 (8th Cir. 1991) (use of screen to permit spectators to hear but not see detective's testimony was in lieu of closure of the courtroom and did not violate the defendant's public-trial right); State v. Schultzen , 522 N.W.2d 833, 836 (Iowa 1994) (public trial right not violated by reasonable alternative to closure, or "quasi-closure," that entailed having three spectators (members of defendant's family) seated behind blackboards during a portion of the victim's testimony so that the line of view between the victim and the family members was obstructed).[8]
The foregoing case law supports a conclusion that the husher procedure employed in this case - an instance of "the long-standing practice in this jurisdiction of conducting individual voir dire at the bench, within the view but outside the hearing of the public," Copeland , 111 A.3d at 634-35 - does not amount to a closure or partial closure of the courtroom, but is more appropriately viewed as an alternative to closure. We think that even more so than the obstructed-view procedures discussed in the foregoing cases, use of a husher during the conduct of individual voir dire at the bench, along with access within a reasonable time to transcripts of the individual prospective-juror examinations,[9] is a reasonable alternative to closure of the courtroom that enables the public to see the court proceedings, including facial expressions and body language of at least some of the participants at the bench, and thus honors the defendant's right to a public trial. We note also that use of the husher avoids the partial closure of the courtroom entailed in the process that appellant's trial counsel told the court had recently been utilized by another judge and that counsel appeared to endorse for use in this case: allowing the public to be in the courtroom as "the jurors [a]re sent in through the back to answer questions" from the witness stand "with the other jurors outside of the courtroom." That procedure would have precluded other prospective jurors from seeing the proceedings at the bench during the questioning of their individual co-venire members. Although they were sworn *241 trial participants, the prospective jurors were nonetheless members of the public who were entitled to view the voir dire proceedings.
In sum, we conclude that use of the husher during individual-juror voir dire did not constitute closure or partial closure of the courtroom, but instead was a "reasonable alternative [ ] to closing the proceeding," Waller , 467 U.S. at 48, 104 S.Ct. 2210, that protected appellant's public-trial right.[10] We therefore reject appellant's claim of error.
III.
Complainant Campbell testified that upon viewing a photo array presented to him by MPD officers, he identified appellant as the shooter. The photo array, with Campbell's initials written near a circle around appellant's face, was published to the jury. Paige testified that he, too, "participated in an identification procedure with the police" and identified appellant as the shooter. The government introduced into evidence and published to the jury the "list of faces that [the police] showed [Paige]."
On appeal, appellant renews his at-trial objection to the trial court's decision to "admit[ ] and allow[ ] the prosecution to publish to the jury photo arrays containing [appellant's] mugshot." Appellant argues that the photo arrays did not satisfy the three-part test this court has adopted for admissibility. We conclude that any error in admission of the photo arrays was harmless beyond a reasonable doubt.
"For admission of 'mug shot type' photographs at trial: 1) [t]he government must have a demonstrable need to introduce the photographs; and 2) [t]he photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and 3) [t]he manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs." See Bishop v. United States , 983 A.2d 1029, 1034 (D.C. 2009). Appellant argues the government did not have "a demonstrable need to introduce the photographs" because "identification was not in issue": appellant admitted that he was the shooter, and his trial counsel signaled in her opening statement that appellant's defense to the AWIKWA charge was self-defense. The government retorts that it carried the "burden to prove appellant committed the charged offenses through admissible evidence" and that Campbell's and Paige's immediate ability to identify appellant "was significant evidence supporting their credibility as witnesses."
We think appellant has the better of the argument about whether there was a demonstrable need to introduce the photo arrays. Campbell told the jury that he circled on the photo array (Government Ex. 7) the photo of "the defendant who shot me" and said at the time, "That's definitely him. I am never going to forget someone that shot me." Similarly, Paige *242 told the jury that upon identifying appellant on the photo array (Government Ex. 10), he made the statements, "That's the guy. I remember him. I won't forget his face." Given all the foregoing, we assume (though without definitively deciding) that, as in (Kirk ) Williams v. United States , 382 A.2d 1 (D.C. 1978), the government had "no reason to show identification" at trial. See id. at 5 ("The government adduced more than sufficient testimony regarding positive photographic identification of appellant to satisfy that need [to survive a motion for judgment of acquittal]; it was not necessary to introduce the photos themselves.").
We must next consider whether any error in permitting introduction of the photo arrays was harmless beyond a reasonable doubt. See ( Lenwood ) Williams v. United States , 481 A.2d 1303, 1304 (D.C. 1984) (applying the constitutional harmless error standard articulated in Chapman v. California , 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ). The reason for the "rigid criteria for ... admissibility" of mugshots is that "introduction of mug shots into evidence ... pose[s] a danger to the defendant's rights by their potential for implying a prior criminal record." Letsinger v. United States , 402 A.2d 411, 414 (D.C. 1979).[11] Examining the photo arrays, the trial judge noted that the photos do not include "prison garb" and have "a gray or dark gray background," and that "it" - it's unclear whether the court was referring to appellant's photo or the entire photo array - "doesn't look ... like a mugshot." Looking at the exhibits ourselves, we agree with the trial judge's first two observations; as to the court's third observation, in our view the unsmiling expressions on the men's faces do suggest that the photos may be mugshots, though appellant's photo in the array looks less like a mugshot (and, perhaps, more like a driver's license photo) than most of the other photos. In addition, it is significant that the mugshot serial numbers, the mugshot.com caption, and the caption "line up with serial numbers" were removed from the photo-array sheet published to the jury. Further, the detective who prepared the photo arrays shown to Campbell and Paige made no mention of the source of the photos in the array.
But even if the jurors could discern that the photos were mugshots, they also knew from the parties' stipulation regarding the "certificate of non[-]registration of a firearm in Washington, D.C. for [appellant]" (which the trial court instructed was "undisputed evidence"), and from the trial court's instructions on the elements of the charged offenses of UF and UA,[12] that appellant did not dispute that he acted in violation of District of Columbia law by bringing an unregistered firearm and ammunition *243 into the District. Despite learning that appellant had broken the law in that way, the jury acquitted him of the charged AWIKWA (car) offense, a verdict we take as evidence that jurors were able to weigh whether the evidence supported conviction notwithstanding the undisputed information they had about appellant's non-compliance with the District's gun laws, which went beyond what an arrest mugshot implies. For that reason, we conclude that introduction of the photo arrays into evidence was harmless beyond a reasonable doubt.
IV.
Appellant asserts that the prosecutor "seriously misstated the law" during his rebuttal closing argument when, after reminding the jury of appellant's testimony that "he was worried ... that the people supposedly beating him up could get his gun," went on to remark that appellant had "brought the gun to the neighborhood," and then told the jury that "a person can't claim self-defense[ ] if they put themselves in the position to ca[u]se the trouble." In addition, appellant highlights that after the court overruled defense counsel's objection to the prosecutor's language, the prosecutor continued his rebuttal by "listing, among the reasons [why appellant] did not act in self-defense, the fact that [appellant] brought that gun there to begin with." Appellant argues that through the foregoing remarks, the prosecutor effectively told the jury that it should find that appellant "forfeited his right to self-defense simply by choosing ... to carry a gun."
"When evaluating a claim of improper prosecutorial argument, we first determine whether or not the challenged argument was improper." Turner v. United States , 26 A.3d 738, 742 (D.C. 2011). "If the argument was improper, we then determine whether or not reversal is warranted, considering (1) the gravity of the improper comments; (2) their relationship to the issue of guilt; (3) the effect of any corrective action by the trial judge; and (4) the strength of the government's case." Id. ; see also Finch v. United States , 867 A.2d 222, 225-26 (D.C. 2005). "If an objection was preserved," we may " 'affirm the convictions [if] we are satisfied that the appellant did not suffer 'substantial prejudice' from the prosecutor's improper comments." Id. at 226 (citing Kotteakos v. United States , 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) ).
Acknowledging this court's case law,[13] the government concedes that "a defendant may be entitled to a self-defense claim even when in unlawful possession of a firearm." The government argues, however, that the prosecutor's remarks did not imply the contrary. Reviewing the prosecutor's remarks as a whole, we are persuaded by the government's argument. See, e.g. , Jones v. United States , 739 A.2d 348, 353 (D.C. 1999) ("A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements must be viewed in context." (internal quotation marks omitted) ). Although in isolation, the remarks appellant highlights may have conveyed the erroneous message about which appellant complains, in his additional remarks, the prosecutor focused on the principle that there is no "right to use excessive force" and then made statements from which we think the jury would have understood that use of the gun in a non-excessive way would have been permissible in self-defense if appellant had perceived that he was in danger. The prosecutor completed his theme by saying: "He brought that *244 gun there. He didn't fire a warning shot. He didn't brandish it." The prosecutor's references to firing a warning shot and merely brandishing the gun were acknowledgments that although appellant was not entitled to use excessive force, he might have been entitled to use the gun in those non-lethal ways to protect himself.
Moreover, it was undisputed from the outset that appellant brought the gun to the scene, and, at various junctures, the jury learned that this did not preclude a finding that appellant acted in self-defense. For example, during defense counsel's opening statement, she told the jury that they would hear that appellant pulled his gun out from his waistband when he was terrified that two men were going to kill him, and then told the jury that appellant, like everyone, has "the right to use reasonable force in self-defense." The prosecutor objected and the court had a conference with counsel at the bench, but after the conference had concluded, defense counsel continued her opening statement by saying that "every citizen has a right to self-defense ... when that person actually believes he ... is in imminent danger of serious bodily harm, and when there are reasonable grounds for that belief." When the prosecutor objected again, the trial court overruled his objection in open court. We think this exchange would have conveyed to the jury that self-defense was not out of the case just because appellant brought a gun to the scene.
The court's instructions to the jury lead us to the same conclusion. The court told the jury that the defense theory regarding the charge of AWIKWA (firearm) charge was that "it was reasonable for [appellant] to believe he was in imminent danger of serious bodily injury or death" and that he "used the degree of force reasonably necessary to defend himself." Thereafter, the trial court gave the jury a lengthy self-defense instruction that included the statement that "[i]f Jonathan Blades actually and reasonably believed he was in imminent danger of death or serious bodily harm, and that deadly force was necessary to repel such danger, then he may use deadly force in self-defense." The trial court also specifically told the jury that "[s]elf-defense is a defense to the charge[ ] of [AWIKWA] Firearm." The court's instructions thus conveyed to the jury that appellant's possession of a firearm did not preclude his claim of self-defense.
Further, even if we assume arguendo that the prosecutor's comments did imply that appellant had forfeited his right to self-defense by bringing a gun to the scene, we would still conclude that appellant did not suffer " 'substantial prejudice' from the prosecutor's improper comments" (quoting Finch , 867 A.2d at 226 ). We note first that the jury had ample basis for rejecting appellant's claim that his actions were in self-defense. The evidence showed that appellant shot his gun nine times; that Campbell, who appellant claims was his assailant, was shot not while facing appellant, but in his back or angled shoulder; and that one of the bullets landed around the corner from the location where appellant testified he began firing his gun. There was also evidence (the absence of stippling) that permitted the jury to infer that Campbell had not been shot when he was in close proximity to appellant's gun. In total, the government's evidence suggested that appellant was shooting at and pursuing targets who were running away from him rather than placing him in imminent danger of bodily harm. Indeed, it seems likely, notwithstanding the competing expert testimony about where the shooter might have been standing when the shots were fired, that the jury would have found the photographic evidence of where the casings came to rest - in a line *245 going up 20th Street toward L Street - and the testimony about the bullet found around the corner on L Street to be strong evidence that appellant was pursuing Campbell.
Further, the jury, which was given an option of convicting appellant of the lesser-included offense of assault with a dangerous weapon (firearm) ("ADW (firearm)"), convicted appellant of AWIKWA (firearm). If jurors had credited appellant's testimony that he acted in self-defense but believed they were precluded from acquitting appellant on that basis simply because he had brought a gun into the District, they presumably would have convicted him of the lesser-included ADW offense and not of AWIKWA (firearm). In convicting appellant of AWIKWA (firearm), the jury necessarily found that appellant acted with an intent to kill when he shot Campbell.[14] For that and all the foregoing reasons, we conclude that even if improper, the prosecutor's remarks did not prejudice appellant, and the trial court did not reversibly err in not taking corrective action.
V.
Appellant's final argument is that the trial court committed reversible error by giving, without a sufficient evidentiary basis, a provocation instruction that told the jury that "[o]ne who deliberately puts himself in a position where he has reason to believe that his presence will provoke trouble cannot claim self-defense." The court additionally instructed the jury that "if one, who is the aggressor or provokes a conflict, later withdraws from it in good faith and communicate[s] that withdrawal by words or actions, he may use deadly force to save himself from imminent danger or death or serious bodily harm."
A provocation instruction "is appropriately given when there is both evidence of self-defense and evidence that the defendant provoked the aggression from which he was defending himself." Rorie v. United States , 882 A.2d 763, 775 (D.C. 2005). We have observed that "where the giving of the instruction is technically incorrect, the error generally is harmless." Id. Under some circumstances, however, such as "where there are earlier discrete episodes of an aggressive, even violent nature," an inappropriately given provocation instruction presents a danger that the jury could have been "confused by the earlier 'provocative' behavior of the defendant that did not operate as a legal trigger of the final ... confrontation between the victim and the defendant." Id. In any event, "it is axiomatic that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Dickerson v. United States , 620 A.2d 270, 273 (D.C. 1993) (internal quotation marks omitted).
The government cites, as evidence of provocation that warranted the provocation instruction, appellant's testimony that after Campbell "grabbed [Mitchell] by the hips," appellant "grabbed [Campbell] by his shoulder" and "turned [Campbell] toward [him]." Whether or not this sufficed as evidence of provocation, we are satisfied that the jury would not have viewed it as conduct that deprived appellant of the right to self-defense or as the trigger of the gun violence that followed. Under appellant's account, what happened immediately afterwards was that Mitchell pulled appellant away "because she ... didn't *246 want the argument to escalate," appellant and Mitchell walked towards appellant's car, and appellant attempted to get into the car - i.e., actions by which appellant signaled his withdrawal from the conflict. Under the account presented by Campbell and Paige, after Campbell knocked appellant down, Campbell moved away from appellant and was pursued by Mitchell, who was hitting Campbell in the head with her high-heeled shoe; and appellant went to his car to retrieve a gun and began shooting at the fleeing men.
If the jurors credited appellant's account, the court's withdrawal-from-the-conflict instruction let them know - notwithstanding appellant's previous aggressive action in grabbing Campbell's shoulder or pushing him - that by his actions to disengage, appellant was restored to his right to use deadly force to save himself from the danger of death or serious bodily harm he told the jury Campbell, Paige, and Rob imminently posed when they followed him to his car. If on the other hand the jury credited the Campbell/Paige account, appellant acted as the aggressor and not in self-defense during the "final episode" of the incident, Rorie , 882 A.2d at 774, 777 - i.e., when Paige saw appellant loading a gun he had retrieved from his car, and when Campbell, who had retreated after blows to his head and who was fleeing northward on 20th Street after hearing Mitchell utter words that Campbell understood to mean that appellant was "going to get [his] gun." Either way, we see no danger that the jury would have confusedly thought that appellant's prior action of turning Campbell around by the shoulder or pushing Campbell was relevant to whether appellant was guilty of AWIKWA firearm. Stated differently, only upon a " 'bizarre reconstruction' of the evidence," Tyree v. United States , 942 A.2d 629, 639 (D.C. 2008), could jurors have thought that appellant acted to ward off imminent harm to himself by shooting at Campbell but was not entitled to a self-defense claim because of the earlier shoulder-grab or push and the rule set out in the provocation instruction.
Further, as already noted, the jury was given an option of convicting appellant of the lesser-included offense of assault with a dangerous weapon (firearm), but convicted him of AWIKWA (firearm), meaning that it found that he acted with an intent to kill. If jurors believed appellant's account, and if what prevented them from acquitting him on the ground of self-defense was that they thought his grabbing of Campbell's shoulder or pushing of Campbell was provocation that caused him to forfeit his self-defense claim, they presumably would have convicted him of the lesser-included ADW offense and not of AWIKWA (firearm).[15] For that reason, too, we conclude that the court's giving of the provocation instruction, if error, was harmless; that is, we are satisfied that "the guilty verdict actually rendered in this trial was surely unattributable to the error." Rorie , id. at 776 (internal quotation marks omitted).
*247 * *
For all the foregoing reasons, we conclude that appellant is not entitled to a reversal of his convictions. However, we remand the matter to the trial court to merge appellant's two PFCV convictions premised on his AWIKWA and AAWA convictions.[16] In all other respects, the judgment of the trial court is
Affirmed.
Farrell, Senior Judge, concurring in part and concurring in the result:
I agree with Judge Thompson's analysis of why use of the husher during voir dire did not violate appellant's right to a public trial. I also agree with her conclusion that, although the government showed no demonstrable need to introduce the photo arrays, any error in their admission was harmless beyond a reasonable doubt. That is partly for the reasons stated by Judge Thompson, ante at 242-43, but also because I believe that, rather than any inference of prior arrest implied by the photo arrays, it was the strong inconsistency between appellant's defense of self-defense and the evidence that produced the guilty verdicts. The shell-casing evidence, among other things, was at odds with appellant's story that immediately fearing for his personal safety he took out his gun and repeatedly fired at Johnny Campbell in an impromptu act of self-defense. Nine expended shell-casings were found lying in roughly a straight line extending twenty feet and more along 20th Street. According to firearms examination expert Barrett, this pattern showed that the shooter was walking and firing along the line where the casings fell. That evidence was consistent with Campbell's account, corroborated by eyewitness Page, that after an exchange of punches appellant withdrew to his car, retrieved a handgun or ammunition for it, then turned and fired multiple shots at Campbell, each requiring a separate trigger-squeeze, as Campbell ran from the scene. Additional evidence summarized by Judge Thompson also confirms that "appellant was shooting at and pursuing targets who were running away from him" and thus not "placing him in imminent danger of bodily harm." Ante at 244.[1]
The hardest issue in this appeal is the prosecutor's repeated erroneous suggestion in rebuttal argument that appellant had forfeited self-defense by the act of bringing "the gun to the fistfight" or "to the neighborhood." Although the trial judge appeared to recognize this error later, he overruled appellant's contemporaneous objection to it and, in instructing the jury on provocation ("[o]ne who deliberately puts himself in a position where he has reason to believe that his presence will provoke trouble cannot claim self-defense"), gave arguable support to it.[2] Nevertheless, like Judge Thompson, I am confident the jury did not reject self-defense because of appellant's having "brought the gun downtown," but instead because of his excessive use of force in the circumstances.
*248 "I will give you the first nine reasons why this was not a case of self-defense," the prosecutor began rebuttal argument: "Bam, bam, bam, bam, bam, bam, bam, bam, bam ... the defendant standing there at the top of that block, walking forward, shooting as he goes...." As stated above, the combined ballistics evidence and testimony of Campbell and Paige strongly favored this scenario of appellant retreating to his car for a gun or ammunition and then firing repeatedly at Campbell when any threat of harm from Campbell or his friends had largely dissipated. The eyewitness and ballistics testimony, the opening statements and closing arguments of the parties, and the jury instructions all focused primarily on this issue of whether, in firing the gun, appellant had used force he actually and reasonably believed necessary to avert immediate harm to his person. While the prosecutor tried to score extra points by erroneously relying on appellant's possession of the gun from the start, I am convinced that this ultimately did not distract the jury from evaluating appellant's actual use of the gun and convicting him based on evidence redolent of excessive force.[3]

Appellant testified that before the fighting began, Rob left "to get the car for another buddy that was inside" and thus was not on the scene.

Campbell also testified that shortly after the shooting ceased, he saw appellant's car coming at him and was hit and "rolled off the car." Appellant was found not guilty of the charges related to this allegation.

Paige agreed that Campbell threw the first punch.

"A 'husher' is a mechanical, white noise device intended to foster the confidentiality of conversations at the bench (in this case, to protect the privacy of prospective jurors)." Barrows v. United States , 15 A.3d 673, 681 n.13 (D.C. 2011).

But see Woods v. Kuhlmann , 977 F.2d 74, 76 (2d Cir. 1992) (joining the Ninth, Tenth and Eleventh Circuits in concluding that "when a trial judge orders a partial, as opposed to a total, closure of a court proceeding at the request of one party, a 'substantial reason' rather than [an] 'overriding interest' will justify the closure").

We also said in Copeland that we could find "no authority ... holding that the practice of conducting a limited amount of individual voir dire at the bench with a 'husher' on violates a defendant's right to a public trial." 111 A.3d at 633. In fact, there is at least one opinion that holds that use of a white noise device during voir dire violates the First Amendment in the absence of findings of fact supporting that restriction on the right of access. See In re Petitions of Memphis Pub. Co. , 887 F.2d 646 (6th Cir. 1989) ; but see id. at 649 (Norris, J., dissenting) ("I do not believe that the district court's limited use of a device which emitted static and its withholding of the transcript of the voir dire until the jury was impaneled violated any rights secured by the United States Constitution" and "I am not convinced that the procedure utilized was tantamount to closing the voir dire to the public.").

As we observed in Kleinbart , "[t]he right to a public trial has never been definitively construed by the Supreme Court." 388 A.2d at 881. The Supreme Court's remand that prefaced the ruling in Rodriguez , see 537 F.3d at 103, suggests that the Supreme Court might agree that use of a device that partially but not fully obstructs the public's ability to perceive trial proceedings, accompanied by reasonable access to transcripts, does not amount to a "closure" for purposes of the Sixth Amendment public-trial right. See Miller v. Rodriguez , 549 U.S. 1163, 127 S.Ct. 1119, 166 L.Ed.2d 888 (2007) (remanding the "screen" issue to the Second Circuit in light of Carey v. Musladin , 549 U.S. 70, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) (pertaining to the meaning of "clearly established federal law") ).

See also State v. Drummond , 111 Ohio St.3d 14, 854 N.E.2d 1038, 1080 (2006) (Moyer, C.J., dissenting) (referring to option of "placing a screen between the witnesses and the spectators to conceal the witnesses from public view" as an alternative to closing the courtroom).

"[T]he constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript ... available within a reasonable time." Press-Enterprise , 464 U.S. at 512, 104 S.Ct. 819.

We disagree with appellant's contention that Jury Questionnaires requires a different result. In our opinion in Jury Questionnaires , we considered the issue of mid-trial and post-trial press "access to the jury questionnaires completed by the sixteen empaneled jurors," 37 A.3d at 882 (italics added), and held that the trial court erred in not recognizing the press's First Amendment right to such access and in failing to consider "alternatives to complete closure" of the questionnaires to public review. We noted that the trial court "had no problem keeping oral voir dire open to the public," id. at 888, but we did not indicate whether a husher was used in the open courtroom and did not consider whether the press had a right to listen contemporaneously to oral voir-dire questioning of individual prospective jurors.

The photo array was of nine African-American men, including appellant. In the view of the author of this opinion, unnecessary publication to District of Columbia juries of photo arrays of African-American men also poses a danger of fostering unconscious bias. See Gause v. United States , 959 A.2d 671, 692 n.7 and n.8 (D.C. 2008) (Blackburne-Rigsby, J., dissenting) (citing a study showing that "although all racial groups harbor a significant amount of unconscious anti-Black bias, the distinction between Blacks and non-Blacks attitudes is great," with "71.5% of Whites, 67.5% of Asians, and 60.5% of Latinos harbor[ing]" an unconscious anti-Black bias, compared to 32.4% of Blacks, and a study showing that "there may be race bias against the selection of Blacks in jury wheels and master jury lists"), rev'd on other grounds , 6 A.3d 1247 (D.C. 2010) (en banc).

I.e. , that "[t]he firearm had not been registered to [appellant], as required by District of Columbia law" and that appellant lacked "a valid registration certificate for a firearm of the same gauge or caliber as th[e] ammunition" he possessed.

See, e.g. , Stewart v. United States , 687 A.2d 576, 579 (D.C. 1996).

The jury was instructed that one of the elements of AWIKWA, "which the [g]overnment must prove beyond a reasonable doubt" in this case, was that "Jonathan Blades intended to kill Johnny Campbell," but that for a conviction of ADW, "the [g]overment need not prove the defendant intended to injure Johnny Campbell."

In Rorie by contrast, the record was "without facts to support that Mr. Rorie was the aggressor or provocateur toward [the stabbing victim/decedent] in the moments before the stabbing, [and] the jury necessarily had to take into account prior, unrelated, and prejudicial acts of Mr. Rorie toward [another person] simply to make sense of the language in the [provocation] instruction." 882 A.2d at 769. The fact that the jury acquitted defendant Rorie of second-degree murder while armed (knife) and convicted him of the lesser-included offense of voluntary manslaughter while armed, id. at 764, suggested that jurors might have accepted his self-defense claim but for the inappropriately given provocation instruction.

See Nixon v. United States , 730 A.2d 145, 153 (D.C. 1999) (holding that PFCV convictions arising out of "a single possession of a single weapon during a single violent act" must "merge into one PFCV conviction").

See In re Oliver , 333 U.S. 257, 270 n.25, 68 S.Ct. 499, 92 L.Ed. 682 (1948) ("The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.") (quoting Cooley, Constitutional Limitations (8th ed. 1927) at 647).

Presley v. Georgia , 558 U.S. 209, 214, 130 S.Ct. 721, 175 L.Ed.2d 675 (2010) (holding that the defendant's public trial right was violated notwithstanding the availability of a transcript); ABC, Inc. v. Stewart , 360 F.3d 90, 99 (2d Cir. 2004) (holding that "where a right of access exists, a court may not deny access to a live proceeding solely on the grounds that a transcript may later be made available") (citation omitted); In re Jury Questionnaires , 37 A.3d 879, 884 (D.C. 2012) (noting that "it is when the trial is unfolding that the public's interest is greatest").

"[T]he Waller test is rightly regarded as a rule of general applicability in the courtroom closure context." Rodriguez, 537 F.3d at 108.