**Dock HIGGENBOTTOM, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 03–CF–1187.

District of Columbia Court of Appeals.

Argued March 29, 2007.

Decided May 10, 2007.

Robert S. Becker, Washington, DC, appointed by the court, for appellant.

John P. Mannarino, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, and Steven B. Snyder, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE–RIGSBY and THOMPSON, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior Judge:

After a jury trial, appellant was convicted of aggravated assault while armed, possession of a prohibited weapon (pipe), and two counts of assault with a dangerous weapon.[1] In this appeal, appellant challenges (1) the trial court's failure to hold additional hearings *sua sponte* before sentencing, in order to examine retroactively appellant's competency at trial;[2] (2) the court's refusal to give a self-defense jury instruction expressly concerning "duty to retreat"; and (3) the court's failure to take additional corrective action, beyond the limiting instruction that it gave *sua sponte*, during the prosecutor's cross-examination of appellant about his prior convictions. We conclude that no reversible error occurred and thus affirm appellant's judgment of conviction.

## I.

On the night of July 10, 2002, the complainant, Tommy Bennett, in search of a misplaced ten-dollar bill, returned to the apartment of his neighbor, appellant Dock Higgenbottom, where Bennett had been drinking with appellant earlier in the evening. After the two briefly conversed in the apartment doorway, appellant struck Bennett twice in the head with a length of pipe. Appellant then slammed Bennett's hand in the door, crushing two fingertips that later had to be amputated, and continued to strike Bennett in the body with the pipe and a hammer as the altercation progressed down the apartment-building hallway.

At trial, appellant asserted self-defense and testified that Bennett had kicked open his apartment door and entered carrying a knife in his waistband, using profanity, and telling appellant "you owe me; you owe me." Appellant admitted striking Bennett with the pipe in the head, hand, and side of the body to remove Bennett from the doorway so that appellant could close the door. Appellant further testified that he had struck Bennett "because he scared me," not with any intent to kill him. Appellant added that he felt vulnerable because of recent abdominal surgery.

## II.

After trial, appellant asked the court to appoint new counsel to represent him at sentencing. The court did so. Upon new counsel's request for an evaluation of appellant's competency, the court approved the services of Dr. Anita L. Boss, a private forensic psychologist who was formerly employed by the Commission for Mental Health. Dr. Boss evaluated appellant at the D.C. Detention Facility and, in a letter dated March 26, 2003, reported her conclusion that appellant was not competent to proceed with sentencing. Dr. Boss observed:

Not only was [appellant's] speech highly animated, but it was also replete with loose associations, tangentiality, and excessive non-essential detail. Mr. Higgenbottom was unable to sustain a discussion of any one topic through to completion without straying to a marginally related issue, though it was possible to re-direct him to the matter being discussed. Once he responded to re-direction, he often rambled off into another area once again. This is not to

---

1. *See* D.C.Code §§ 22–402, –404.01, –4502, –4514 (2001). The jury acquitted appellant of mayhem while armed and assault with intent to kill while armed.

2. Counsel for appellant acknowledged at oral argument that no question was presented in this appeal with regard to appellant's sanity at the time of the offense.

say that his speech was incoherent. It was easy to understand what he was talking about, but it was clear that he was unable to sustain concentration and communicate meaningfully and consistently about one issue at a time. This is the most important factor relating to his competency to proceed with sentencing, as it casts substantial doubt on his ability to follow legal proceedings and to effectively communicate with counsel.

. . . .

His delusional system was mostly related to racial themes, some of which stem from actual events he experienced as a young person. Some of the content of Mr. Higgenbottom's delusional ideation was directly related to his recent jury conviction and to Judge Canan. He was unable to sustain a rational discussion regarding the fact that he is facing sentencing after being convicted by a jury.

Dr. Boss also noted the need for further inquiry into appellant's competency at the time of trial because of "the possibility that he may have been actively mentally ill at the time." The doctor added, however, that "a full evaluation to determine if he is competent to waive an insanity defense seemed premature" until after mental health treatment was re-initiated. After receiving Dr. Boss's report, counsel filed a motion for appellant's transfer to St. Elizabeths Hospital for a competency evaluation, treatment, and a retroactive evaluation of competency at the time of trial.

At an April 2, 2003, status hearing, the trial court ordered a forensic screening of appellant in the Superior Court cellblock. Later in the day, after receiving a report from clinical psychologist Dr. Robert Benedetti,[3] the court ordered appellant transferred to St. Elizabeths Hospital for treatment and evaluation. At St. Elizabeths,

he began a treatment program that included antipsychotic medications. On June 5, 2003, the trial court issued an order directing that appellant also be examined for a determination of his "competency to proceed with trial (retroactive competency exam)," with a report due by June 12, 2003.

By letter dated June 11, 2003, the D.C. Department of Mental Health (DMH) responded to the trial court's order:

> Dr. Abdul Ahad, staff psychiatrist, recently examined Mr. Higgenbottom and the following determinations were made at a diagnostic staff conference. Although he has a factual understanding of the sentencing proceedings pending against him, he is incompetent to proceed with sentencing by virtue of not having a rational understanding of the proceedings pending against him and being unable to consult with counsel with a reasonable degree of rational understanding.
>
> He has been diagnosed with Bipolar I Disorder, Most Recent Episode Manic, Moderate and Alcohol Abuse, By History. He also has a seizure disorder. He is currently receiving [four different medications]. Further, it is likely that Mr. Higgenbottom will attain competency to proceed with sentencing in the foreseeable future.

DMH then added: "We are unable to assess retroactive competency to stand trial at this time, since we have [not] received transcripts and other information needed to conduct this examination."

At a June 13, 2003, status hearing, the trial court reviewed the DMH report that appellant was not competent to proceed with sentencing. The court noted that the

---

**3.** Dr. Benedetti reported his clinical opinion that appellant was "unable to participate in court proceedings at this time" and was in

need of immediate hospitalization, further evaluation, and close monitoring for suicidal behavior.

report "didn't resolve or give an opinion regarding [appellant's] competency back at the time of trial," and the court questioned counsel about the delay in transmitting the trial record to the doctors. Following the hearing, appellant continued treatment, and on or around August 7, 2003, sentencing counsel delivered the trial transcripts to St. Elizabeths Hospital.

On August 14, 2003, DMH reported an updated set of conclusions to the trial court:

> Dr. Abdul Ahad, staff psychiatrist, recently re-examined Mr. Higgenbottom and the following determinations were made at a diagnostic staff conference. He is competent to proceed with sentencing by virtue of having a factual and rational understanding of the proceedings pending against him and being able to consult with counsel with a reasonable degree of rational understanding.

> Further, regarding retroactive competency to stand trial, he was competent to stand trial by virtue of having a factual and rational understanding of the proceedings pending against him and being able to consult with counsel with a reasonable degree of understanding.

At a status hearing on August 15, 2003, the court acknowledged the findings in the DMH report that appellant had been restored to competency and that appellant had been competent at the time of trial. Appellant's sentencing counsel agreed that appellant was "competent to go forward," but asked to be allowed "to further investigate the issue of competency at the time of trial" because appellant had not been medicated at the time of trial and had a history of treatment for mental illness, including a period of commitment in the 1970s after pleading insanity in a murder trial. Counsel stated that she anticipated filing a motion for a new trial "raising issues of why [trial counsel] didn't raise any of these issues."

Over the government's objection, the trial court stayed the sentencing proceeding for thirty to forty-five days and invited appellant's sentencing counsel to investigate further the matter of competency. The court offered to authorize funds for additional examination of appellant and told counsel to "file whatever you feel is appropriate to file" to challenge sanity, competency, or trial counsel's failure to raise either issue at trial. The court explained that if a defense filing "causes me to think [the case] should be taken off the sentencing track, then I'll hear from the Government, I'll do it. If not then we won't and we'll go to sentencing and we can litigate it ... in some other way." The court further commented:

> It may be a moot point.... I mean, I did hear the trial ... and had a lot of contact with Mr. Higgenbottom leading up to it, as well. And, you know, he was always very passionate about what he thought happened in this case, and testified, and et cetera. So this may all ... not go very far, but it might. I don't know.

While the sentencing proceeding was stayed, neither appellant's sentencing counsel nor appellant himself (who by this time had been found competent) proffered any evidence or filed any motion in response to the court's invitation to "file whatever you feel is appropriate to file." The day before sentencing, appellant's counsel sent a letter to the court recommending a sentence of probation with mental health treatment or, alternatively, a "short period of incarceration followed by a lengthy period of supervised release with the requirement that he obtain and maintain a regular course of mental health treatment." Counsel reported that the medication was having a "dramatic effect" on appellant and indicated her lay opinion "that if [appellant] had had the benefit of his medications during the pretrial phase of his case, he would have been able to

understand that[,] while according to his version of the offense some of his conduct might have been justified, ... the extent of the assault of the complainant was excessive and was not in self-defense or defense of property."

At the sentencing hearing on October 10, 2003, appellant's counsel did not request further investigation or hearings; rather, she asked the court to take appellant's mental illness into consideration in the sentencing determination. Counsel expressed her disagreement with DMH's conclusion that appellant had been competent at the time of trial, basing her conclusion on her own lay observations of appellant both on and off his medication. Speaking on his own behalf, appellant indicated that he "probably would have acted differently" and "signed a plea bargain and get all this over with" had he been on medication at the time of trial. The trial court subsequently sentenced appellant to concurrent sentences of up to ten years' imprisonment, along with a term of supervised release and an assessment of costs payable to the crime victims' fund.

### III.

■■■ We address, first, appellant's contention that the trial court abused its discretion by not conducting additional hearings *sua sponte* to evaluate, retroactively, appellant's competency at the time of trial. He acknowledges that, at the time of sentencing, the trial court possessed a court-ordered evaluation from the Department of Mental Health reporting that he had been competent at the time of trial.

■■■ Constitutional due process requires that a criminal defendant be mentally competent for a trial to proceed. *Medina v. California*, 505 U.S. 437, 439, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). "[T]he test must be whether he has suffi-

cient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (internal quotation omitted); *accord Godinez v. Moran*, 509 U.S. 389, 396, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993); *Phenis v. United States*, 909 A.2d 138, 152 (D.C.2006). "Where there is evidence raising a substantial doubt as to a defendant's competency to stand trial, the trial judge is under a constitutional duty to order a hearing sua sponte." *Phenis*, 909 A.2d at 152. We review a court's competency determination and decision whether to hold a competency hearing in the absence of a request for one for abuse of discretion, "the exercise of which we will not lightly disturb." *Id.*

Considering all the circumstances before the trial court, we cannot agree with appellant's contention that the evidence raised a "substantial doubt" about his competency at time of trial. Certainly, once appellant's sentencing counsel began looking into the issue of competency, facts emerged that raised an initial concern for the court. For example, appellant had a history of mental health issues, including a period of criminal commitment in the 1970s and a more recent period of treatment with antipsychotic medication. (Apparently, however, he was not on medication when he went to trial—a fact that could cut for, or against, competency.) Furthermore, appellant was declared incompetent to proceed with sentencing within five months after conclusion of his trial. *Cf. Phenis*, 909 A.2d at 156 (considering defendant's mental history before and after offense relevant when evaluating sanity at time of offense).[4]

---

4. In our view, a number of other factors cited by appellant fail to distinguish his behavior

from that which could be expected of compe-

We are satisfied, however, that the trial court did not abuse its discretion in addressing these concerns about appellant's competency. Once sentencing counsel raised the issue of appellant's mental health, the court ordered an evaluation not only of appellant's present competency to face sentencing, but also of his past competency at time of trial. Sentencing was delayed for four months while appellant received treatment and was evaluated by DMH personnel. DMH initially reported that it was "unable to assess retroactive competency to stand trial at this time, since we have [not] received transcripts and other information needed to conduct this examination." After the transcripts were delivered, however, the agency reported that appellant had been "competent to stand trial by virtue of having a factual and rational understanding of the proceedings pending against him and being able to consult with counsel with a reasonable degree of understanding."[5] This conclusion was generated at a "diagnostic staff conference" following a re-examination of appellant by staff psychiatrist Dr. Ahad and represented expert evidence rebutting sentencing counsel's lay speculation that appellant had not been competent at trial.

Notably, the trial court did not end the inquiry and close the record upon its receipt of the DMH report, even though the court, like appellant's original trial counsel, had had ample opportunity to observe and personally interact with appellant throughout the trial proceedings.[6] Giving appellant every opportunity to inform the court's exercise of discretion, the trial court—over the government's objection—postponed sentencing for eight more weeks, offered to authorize funds for additional psychiatric evaluation of appellant, and invited appellant and his counsel to "file whatever you feel is appropriate to file" before sentencing.

Appellant did not file any additional motions or proffer any rebuttal evidence. Thus, at the time of the rescheduled sentencing hearing, the DMH report remained uncontested evidence, and there was no "substantial doubt" as to appellant's competency at time of trial. The trial court fulfilled its obligation to inquire into appellant's competency, and any further advocacy on appellant's behalf at this point was the responsibility of appellant and his counsel. We are satisfied that, under the circumstances, the trial court acted within its discretion when it proceed-

---

tent persons, such as appellant's belief in divine intervention and attempts to explain his past convictions. *Cf. Phenis*, 909 A.2d at 150–152 (finding no substantial doubt raised as to competency of defendant "singing and swinging in his chair" and trying to communicate with members of the jury).

5. The language tracks both the competency standard set forth by the U.S. Supreme Court and the language of the DMH conclusions in earlier reports finding that appellant was not competent to proceed. *See Dusky*, 362 U.S. at 402, 80 S.Ct. 788 ("[T]he test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.") (internal quotation omitted).

6. The fact that appellant's trial counsel did not raise any concern regarding appellant's competency is a factor that may be considered when evaluating appellant's competency at the time of trial. *See Clyburn v. United States*, 381 A.2d 260, 263 (D.C.1977), *cert. denied*, 435 U.S. 999, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978). In addition, the trial court, when staying the sentencing proceeding, indicated its own view that competency "may be a moot point.... I mean, I did hear the trial ... and had a lot of contact with Mr. Higgenbottom leading up to it, as well. And, you know, he was always very passionate about what he thought happened in this case, and testified, and et cetera. So this may all ... not go very far...."

ed with sentencing and did not hold additional hearings *sua sponte.*

## IV.

■ We next consider appellant's contention that he is entitled to a new trial because the trial court erroneously declined his request for instruction of the jury pursuant to Criminal Jury Instruction 5.15—which addresses the duty of a defendant to retreat before using force in self-defense—alongside the other self-defense instructions which the trial court did give. Instruction 5.15 provides:

> The law does not require a person to retreat or consider retreating when s/he actually and reasonably believes that s/he is in danger of death or serious bodily harm and that deadly force is necessary to repel that danger. But the law does say that a person should take reasonable steps, such as stepping back or walking away, to avoid the necessity of taking a human life, so long as those steps are consistent with the person's own safety. In deciding whether the defendant acted reasonably, you should therefore consider whether the defendant could have taken those steps, consistent with his/her own safety.

CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, Instruction No. 5.15 (4th ed. rev. 2002).

■ Generally, "[w]hen a defendant requests an instruction on a theory of the case that negates his guilt of the crime charged, and that instruction is supported by any evidence, however weak, an instruction stating the substance of the defendant's theory must be given." *Gray v. United States,* 549 A.2d 347, 349 (D.C. 1988) (citing, among other cases, *Stack v. United States,* 519 A.2d 147, 154 (D.C. 1986)). The trial court did not believe that Instruction 5.15 was warranted under the facts of the case.[7] The government concedes, however, that the instruction should have been given, and thus we will assume error and consider only its impact: harmless or reversible error?

■ To find an instructional error harmless, "we must be satisfied 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *Brooks v. United States,* 599 A.2d 1094, 1101–02 (D.C.1991) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). Accordingly, an error will be harmless, and will not be reversible, when the instructions the court actually gave "adequately presented the defense theory" and "properly inform[ed] the jury of the applicable legal principles involved," despite the erroneous omission. *See Gray,* 549 A.2d at 351; *Stewart v. United States,* 687 A.2d 576, 578 (D.C.1996). The "key question," then, "is whether the instructions to the jury were an adequate statement of the law, and our task is to review the instructions as a whole to determine whether they fairly

7. The court expressed concern over whether Instruction 5.15 was appropriate in non-homicide cases and, if so, whether a prerequisite for the instruction was the use of deadly force and whether appellant in fact used deadly force. We note that the Comment to Instruction 5.15 does not limit the instruction's use to homicide cases; it simply states that "[t]his instruction should be given in any case in which the jury could reasonably find that the defendant used deadly force," with "deadly force" defined in Instruction 5.13 as "force that is likely to cause death or serious bodily harm." The Comment to Instruction 5.15 also indicates that "no case authority could be found applying this instruction in cases where no deadly force is used" and that "case authority outside the jurisdiction suggests that in a case involving nondeadly force the jury should not be instructed on the defendant's failure to retreat."

and fully presented the defense theory." Stack, 519 A.2d at 155 (citations omitted).

At trial, appellant admitted using force against Bennett but contended that his use of force was justified as self-defense. Under this theory, the central questions for the jury were (1) whether appellant actually and reasonably believed that he was in imminent danger of bodily harm, and (2) whether he used only reasonable force to repel the perceived attack. See Smith v. United States, 686 A.2d 537, 545 (D.C. 1996), cert. denied, 522 U.S. 839, 118 S.Ct. 115, 139 L.Ed.2d 67 (1997). The trial court provided the jury with a lengthy self-defense instruction, including, at appellant's request, Criminal Jury Instruction 5.14(a) on the use of non-deadly force in self-defense where appearances are false and, at the government's request, Criminal Jury Instruction 5.13(c) on the use of excessive force. In the final self-defense instruction, the court stated:

> Now, ladies and gentlemen, I want to now instruct you on the defense that has been raised in this case; that is, the defense of self-defense.
>
> Every person has the right to use a reasonable amount of force in self-defense if, one, he actually believes he is in imminent danger of bodily harm, and two, he has reasonable grounds for that belief.
>
> The question is not whether, looking back on the incident, you believe that the use of force was necessary. The question is whether the defendant, under the circumstances as they appeared to him at the time of the incident, actually believed he was in imminent danger of bodily harm and could reasonably hold that belief.
>
> The defendant is not required to prove that he acted in self defense. Where evidence of self-defense is presented, the government must prove beyond a reasonable doubt that the defendant did not act in self-defense. If the government has failed to do so, you must find the defendant not guilty.
>
> A person may use a reasonable amount of force in self-defense. A person may use an amount of force which, at the time of the incident, he reasonably believes is necessary to protect himself from imminent bodily harm.
>
> Even if the other person is the aggressor and the defendant is justified in using force in self-defense, he may not use any greater force than he actually and reasonably believes to be necessary under the circumstances to prevent the harm he reasonably believes is intended. In deciding whether the defendant used excessive force in defending himself, you may consider all the circumstances under which he acted. A person acting in the heat of passion caused by an assault does not necessarily lose his claim of self-defense by using greater force than would seem necessary to a calm mind. In the heat of passion, a person actually and reasonably may believe something that seems unreasonable to a calm mind. Further, ladies and gentlemen, if the defendant actually and reasonably believes it was necessary to use force to prevent imminent bodily harm to himself, he may use a reasonable amount of force even though, afterwards, it turns out that the appearances were false.

 We are satisfied that this instruction "fairly and fully presented the defense theory" of self defense and that the conceded error in failing to include Instruction 5.15 was harmless. See Stack, 519 A.2d at 155. When considering an instructional error, our primary concern is whether the error denied the defendant sufficient instruction on a legal or factual theory "that negates guilt of the crime charged," Gray, 549 A.2d at 350–51, which, in this case, is the theory of self-defense.

*Compare Stewart*, 687 A.2d at 578 (finding no reversible error where jury was instructed as to "applicable legal principles" of self defense but not as to whether defendant's unlawful possession of a firearm might negate the defense) *with Adams v. United States*, 558 A.2d 348, 349–50 (D.C. 1989) (reversing because of failure to instruct on self-defense in general). The instructions that were given covered appellant's legal theory and left defense counsel the opportunity, if desired, to argue the non-existence of a duty to retreat in closing arguments. *See Stewart*, 687 A.2d at 579–580. The court even invited defense counsel to make such arguments, stating "I think you can argue, obviously, and I'm sure you will, that from your perspective, from the defendant's perspective, this event happened in his home and he was being attacked, so he had nowhere to go."

It is important to note that the additional instruction was not necessary for appellant to rebut the government's implication that appellant *did have* a duty to retreat. Under the government's version of events, Bennett presented no threat to appellant and gave appellant no need to retreat. The government based its theory of guilt on appellant's use of *excessive* force, not merely *any* force, in removing Bennett from the apartment and attacking him down the hallway—a theory under which appellant could be convicted regardless of whether he initially had a privilege to use force rather than a duty to retreat. For these reasons, we are satisfied that, despite the erroneous instructional omission, the self-defense instructions that were given fairly and fully presented the defense theory.

## V.

Finally, we are not persuaded by appellant's contention that the trial court erred by failing to take corrective action, beyond the limiting instruction it gave *sua sponte*, after the prosecutor impeached appellant with his prior convictions. Appellant contends that he now "is entitled to a new trial" because "the prosecutor's misconduct violated Mr. Higgenbottom's Fifth Amendment right to due process, and . . . the Trial Court's instruction could not cure the error."

When evaluating a claim of improper questions or comments by a prosecutor, we first must determine whether any or all of the challenged statements were improper. *McGrier v. United States*, 597 A.2d 36, 41 (D.C.1991). "If we conclude that they were, we must then, viewing the remarks in context, consider the gravity of the [error], its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case." *Id.* (citation and internal quotation omitted). When the issue is preserved with a timely objection by defense counsel, this court reviews for "substantial prejudice." [8] *Id.* In the present case, however, we review for "plain error," because the trial court intervened in the questioning *sua sponte*, and appellant did not timely object to the sufficiency of the trial court's corrective action. *See Finch v. United States*, 867 A.2d 222, 226–28 (D.C.), *cert. denied*, 544 U.S. 1055, 125 S.Ct. 2313, 161 L.Ed.2d 1100 (2005). Under the plain error standard, reversal "is appropriate only in a 'particularly egregious' case, when 'a miscarriage of justice would otherwise result.'" *Id.* at 226 (quoting *McGrier*, 597 A.2d at 41).

---

8. "The test for determining 'substantial prejudice' is well settled: whether we can say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *McGrier*, 597 A.2d at 41 (citations and internal quotation omitted).

We begin by considering the context of the alleged error. As the prosecutor asked about appellant's various convictions, appellant denied some of them but volunteered details about one conviction that was based on facts ostensibly similar to those in the present case. According to appellant's testimony, in the incident underlying that prior conviction, a man attacked appellant and appellant "ended up with a pipe and beat him," allegedly in self-defense. The government objected and moved to strike appellant's answer as non-responsive, but the objection was overruled. After the prosecutor asked about other convictions, appellant continued his description of the first conviction, stating, "I went to court.... And I admitted it. I beat the [*expletive*] because he didn't get a chance to beat me." The prosecutor asked additional questions to clarify which convictions appellant was admitting and eventually made an inquisitive statement to appellant: "That's the case where you beat the man with the pipe."

After appellant replied in the affirmative, the trial judge intervened *sua sponte* and delivered the following instruction to the jury:

Ladies and gentlemen, you've heard evidence that the defendant in this case has been convicted previously of a crime. A defendant's prior criminal conviction is admitted into evidence for your consideration in evaluating his credibility as a witness. The fact that the defendant was convicted of a crime in the past is not evidence that the defendant is guilty of the offense with which he is charged in this case.

You must not draw any inference of guilt against the defendant from his pri-

or conviction. You may consider this prior conviction in evaluating the credibility or believability of his testimony in this case.[9]

Defense counsel raised no objection either to the original questioning or to the sufficiency of the judge's *sua sponte* limiting instruction.

■ Reviewing the questions of the prosecutor, we perceive a valid concern with respect to the final statement (intended to elicit a response): "That's the case where you beat the man with the pipe." Even when a defendant's previous convictions are admissible for impeachment purposes, a prosecutor may not use the convictions in a way that would cause "reasonable jurors [to] naturally and necessarily regard the manner in which the impeachment is accomplished as implying that the defendant is guilty of the crime charged because he was guilty of past crimes." *Dorman v. United States,* 491 A.2d 455, 460 (D.C.1984) (en banc). The prosecutor's statement here highlighted facts from the previous conviction that were alarmingly similar to the facts of the present conviction. When considered out of context, the question appears improper.

We conclude, however, that, when viewed in light of the surrounding circumstances, the prosecutor's question was virtually innocuous, and appellant has not shown substantial prejudice resulting from the statement, much less plain error with regard to sufficiency of the trial court's corrective action. The prosecutor was entitled to ask follow-up questions to clarify the witness's non-responsive answers, and the final problematic statement (tantamount to a question) was phrased in appellant's own words from just moments earlier.[10] The questions about prior con-

---

9. The court also repeated this instruction later that same day in the final jury charge. [10/21/02 Tr. 142]

10. The prosecutor said: "That's the case where you beat the man with the pipe." Appellant moments earlier had stated: "I ended up with a pipe and beat him" and "I beat the

victions were not immediately and prejudicially juxtapositioned with questions about the present offense, *see Dorman,* 491 A.2d at 459, and the details of the convictions were not re-elicited during closing argument.[11] Furthermore, the evidence against appellant was very strong, with appellant conceding his use of force against Bennett and resting his defense on an attempt to convince the jury that his conduct under the circumstances had been necessary and reasonable, a contention that the jury ultimately did not accept.[12]

Finally, and importantly, the trial judge interrupted the questioning *sua sponte* and gave a rather lengthy curative instruction to the jury explaining the proper use of evidence of prior convictions. We presume juries follow instructions on the law. *Harris v. United States,* 602 A.2d 154, 165 (D.C.1992) (en banc). Moreover, it is not clear what other corrective action, short of declaring a mistrial, appellant believes was warranted, and we are satisfied that the failure of the court to grant a mistrial *sua sponte* was not unreasonable and certainly did not threaten a miscarriage of justice. *See Peyton v. United States,* 709 A.2d 65, 69 (D.C.), *cert. denied,* 525 U.S. 854, 119 S.Ct. 134, 142 L.Ed.2d 108 (1998).

*Affirmed.*

[*expletive*] because he didn't get a chance to beat me."

11. In closing argument, after explaining that appellant's previous convictions could only be used to assess his credibility, the prosecutor reminded the jury that appellant "did admit this assault conviction, assault with a deadly weapon conviction in Ohio in 1966, although he did give a lot of explanation with it."

12. The trial court stated to appellant at the sentencing hearing:

There is no reason on earth why this man needed to be beat the way he was beat. And you may have thought that he was *doing something against you,* and I instructed the jury, as your lawyer asked me to, on self-defense. But I didn't believe it, the jury didn't believe it, and you really beat this man bad. And he's lucky you didn't kill him, that's the bottom line, you're lucky you didn't kill him. And over what, just because he was bothering you in some way?