*Notice:  This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-464

STEVEN WILSON, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF3-10530-17)

(Hon. José M. López, Trial Judge)

(Argued March 9, 2021                                   Decided January 6, 2022)

*Cecily E. Baskir* for appellant.

*Patricia A. Heffernan*, Assistant United States Attorney, with whom *Michael R. Sherwin*, Acting United States Attorney at the time, *Elizabeth Trosman*, *John P. Mannarino*, *Nicole E. McClain*, and *Gregory P. Rosen*, Assistant United States Attorneys, were on the brief for appellee.

Before GLICKMAN, *Associate Judge*, THOMPSON,[*] *Associate Judge*, and GREENE, *Senior Judge, Superior Court of the District of Columbia*.[**]

---

[*]    Judge Thompson was an Associate Judge of the court at the time of argument.  Although her term expired on September 4, 2021, she will continue to serve as an Associate Judge until her successor is confirmed.  *See* D.C. Code § 11-1502 (2012 Repl.).  She was qualified and appointed on October 4, 2021, to perform judicial duties as a Senior Judge and will begin her service as a Senior Judge on a date to be determined after her successor is appointed and qualifies.

(continued…)

GREENE, *Senior Judge*:

## I. Introduction

Appellant, Steven Wilson, was convicted by a jury of conspiracy to commit burglary, unarmed kidnapping, unarmed first-degree burglary with the intent to assault and commit theft, assault with a dangerous weapon, threat to kidnap or injure, and unlawful entry. On appeal he argues that **(1)** the evidence was insufficient to sustain his convictions for conspiracy to commit burglary and burglary, (2) the trial court erroneously refused to instruct the jury on a claim of right defense, (3) the trial court abused its discretion by improperly admitting a witness's prior consistent statements and text messages, and (4) his unlawful entry conviction should have been merged with his burglary conviction. For the reasons that follow, we affirm in part and vacate in part.

## II. Background

---

(…continued)

** Sitting by designation pursuant to D.C. Code §11-707(a) (2012 Repl.).

The evidence at trial disclosed that Hunion Henderson, the complainant was a fifty-five-year-old man with a long addiction to crack cocaine who lived alone in a one-bedroom apartment in the northeast quadrant of Washington, D.C. Lori Fitzgerald (also known as Zakiya Ahmed) was Henderson's crack dealer, and he invited her to live in his home but did not think she was planning to sell drugs there. While Henderson was in the hospital, Ahmed brought her boyfriend, "Fanbone," to live at Henderson's apartment and moved her television, food, and other items into the apartment, whereupon the two began selling drugs out of the apartment.

After Henderson returned home from the hospital, he allowed Ahmed and Fanbone to stay for a while, and they took over his bedroom while he slept on the couch. Henderson said he never gave them permission to sell drugs out of the apartment, but they sold him crack in exchange for his monitoring the door and not "putting them out or calling the police." Eventually, when Henderson asked Fanbone and Ahmed to either leave or stay but to cease selling drugs out of the apartment, they refused to do either.

When Henderson visited his family for Thanksgiving in 2016, his family noticed he did not look well and decided he should not return to his apartment.

They contacted their cousin, a retired police officer, who in turn contacted Metropolitan Police Department (MPD) Sergeant Curt Sloan.

Henderson thereafter entered a rehab program and met Larry Kimbrugh. Kimbrugh was kicked out of the rehab program for using drugs, and Henderson let him stay at his apartment. Meanwhile, Sergeant Sloan called Henderson while Henderson was still in rehab; Henderson told him that there were guns in his apartment and people selling drugs there, and he wanted those people to leave.

When Henderson returned from rehab, Kimbrugh had become "close" with Ahmed and Fanbone. Henderson relapsed after moving back into his apartment. On January 1, 2017, Henderson met appellant Wilson there when appellant came to the apartment to spend time with Ahmed and others for appellant's birthday party.

On January 4, 2017, Sergeant Sloan and fellow officers burst into the apartment to execute a search warrant. The officers removed Ahmed, Fanbone, Kimbrugh, and others from the apartment, while Henderson stayed inside.[1]

---

[1] Appellant was not one of the people present at the time the police executed the search warrant.

Sergeant Sloan asked Henderson if he was willing to cooperate with the United States Attorney's Office so they could help him get Ahmed and the others out of his home, and Henderson agreed. At one point while Sergeant Sloan was still at the apartment, Ahmed called Henderson and asked to pick up her clothes and other items from the apartment. Henderson gave the phone to Sergeant Sloan who told Ahmed she could not return to the apartment and would be arrested if she did.

Henderson and Ahmed began texting later that night. Ahmed repeatedly texted Henderson asking to retrieve her things. He told her she could not come back. Ahmed texted Henderson asking whether she should send "Rochelle or India or my Protector!!! Or are we gonna get it right the first time?" Henderson interpreted Ahmed's reference to her "protector" to mean someone who would retrieve her property by force or "any means necessary." Henderson eventually heard India Frazier, Ahmed's friend, banging on the door saying that she knew he was in there. He did not respond and instead called the police, but the police did not respond.

Frazier testified that Ahmed asked her to help move Ahmed's belongings out of Henderson's apartment because the police ejected her and Henderson would not return her things. She further testified that when they arrived and Henderson did

not answer the door, Ahmed called appellant Wilson and told him that she needed him to do something for her. Ahmed directed appellant to meet them on Taylor Street and "to bring his friend," which Frazier testified that she understood to mean a knife or a gun. Ahmed picked up appellant with Frazier, and Ahmed explained that Henderson called the police on her and her boyfriend and now would not let Frazier in to pick up Ahmed's things. Frazier said they did not discuss violence in the car, but she understood appellant's role was to be the "strong arm" and that Henderson "was the type of person you could holler at and [he would] do what he was told."

When they arrived back outside Henderson's apartment, they met Kimbrugh who agreed to help them get into the apartment. After using drugs, Kimbrugh, Frazier, and appellant went to Henderson's door. Frazier saw appellant holding a black gun the size of a "Glock." Kimbrugh knocked and said "open the door." When Henderson opened the door, appellant pushed Frazier, Frazier pushed Kimbrugh, and they all "fell into the apartment." Frazier immediately took two phones from Henderson's person and called him a snitch. Frazier testified that appellant then pistol-whipped Henderson in the face, made him get on the ground, and hit him as she and Kimbrugh removed items from the apartment.

Henderson testified to the same sequence of events, and he further testified that appellant stomped on his face, covered his face with a cloth, and told him, "[Y]ou f****t motherf****r, I should shoot you." Meanwhile, Henderson saw Frazier and Kimbrugh taking items out of the apartment, only some of which belonged to Ahmed. Appellant ordered Frazier to "take everything else out of [Henderson's] pocket," whereupon Frazier and Kimbrugh then took Henderson's chain, ring, and money from his pocket and his boots from his room. They also took two televisions, only one of which belonged to Ahmed.

While the others were removing property from the apartment, appellant guarded Henderson, accusing him of "g[etting] his friend locked up," and called him a "snitch." Ahmed then arrived and whispered to Henderson "in an evil tone" saying, "[Y]ou thought you got away with it, you thought I wasn't gonna get my stuff," and, "[Y]ou got my nephew locked up and you got my friend locked up." When appellant stated, "Let me shoot this n***, Sis," Ahmed replied, "Beat him up, but don't shoot him."

After the group left, Henderson called 911 twice. On the first call he stated, "They just got done beating me up and pistol-whipped me," and "I'm in a daze

right now . . . , please hurry up." On the second call he said, "I told you I got pistol-whipped"; "I just got whupped"; and "my eye is messed up."

Police and an ambulance arrived and took Henderson to the hospital. MPD Officer Darren Reaves's body camera captured multiple conversations between himself and Henderson on the way to the hospital and at the hospital about the events. These videos were all entered into evidence. Officer Christian Glynn was also present at the hospital when the officers questioned Henderson.

Henderson described appellant to Officer Glynn as a sixty-year-old Black man with a beard and short hair who weighed just under 200 pounds. Henderson said he knew appellant because appellant came to Henderson's apartment on January 1, on appellant's birthday a few days prior to the incident. Appellant told the officers that appellant, Ahmed, Kimbrugh, and Frazier removed items from his apartment and that appellant struck him in the face with a gun, causing injuries to his forehead and his eye.

Frazier, Henderson, Officer Christian Glynn, Sergeant Sloan, and Officer Tara Tindall testified on behalf of the government, describing the foregoing

events.[2]  Ronetta Johnson, the defense's criminal investigator, and Officer Reaves testified on behalf of the defense.  The defense's focus was on the impeachment of the government's two key witnesses, Henderson and Frazier.

On September 26, 2018, the jury found appellant not guilty of armed kidnapping, armed first-degree burglary, armed robbery, obstruction of justice, and three counts of possession of a firearm during a crime of violence.  However, they found him guilty of conspiracy to commit burglary, unarmed kidnapping, unarmed first-degree burglary, assault with a dangerous weapon, threat to kidnap or injure, and unlawful entry.  Appellant was sentenced to 120 months' imprisonment and timely appealed.

### III.  Analysis

#### A.  Sufficiency of the Evidence

Appellant argues that the evidence at trial was not sufficient to sustain his convictions for conspiracy to commit burglary and burglary.  The burden is on

---

[2]  Tara Tindall is an MPD officer who assisted in executing the search warrant that was originally intended to find Ahmed but instead resulted in the arrest of appellant with whom Ahmed was supposedly staying at the time.  Her testimony was used to identify Wilson at trial.

appellant when he is attacking the sufficiency of the evidence. *Olafisoye v. United States*, 857 A.2d 1078, 1086 (D.C. 2004). This court "must deem proof of guilt sufficient if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Bassil v. United States*, 147 A.3d 303, 307 (D.C. 2016) (quoting *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc), in turn quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original).

Conspiracy to commit a crime requires that "(1) two or more persons formed an agreement to commit a [crime], (2) the defendant knowingly participated in the conspiracy with the intent to commit the offense, and (3) at least one person involved in the conspiracy committed one of the charged overt acts." *Perez v. United States*, 968 A.2d 39, 104 (D.C. 2009) (quoting *Pearsall v. United States*, 812 A.2d 953, 960 (D.C. 2002)). In this case, the underlying crime was burglary; consequently, the government was required to show a conspiracy to commit burglary. D.C. Code § 22-801(a) provides:

> Whoever shall . . . enter . . . any dwelling, or room used as a sleeping apartment in any building, with intent . . . to commit any criminal offense, shall, if any person is in any part of such dwelling or sleeping apartment at the

> time of such . . . entering, . . . be guilty of burglary in the first degree.

The evidence in this case was sufficient to establish a conspiracy to commit burglary based on an agreement to enter Henderson's apartment with an intent to steal or commit an assault. "A conspiratorial agreement may be inferred from circumstances that include the conduct of defendants in mutually carrying out a common illegal purpose, the nature of the act done, the relationship of the parties and the interests of the alleged conspirators." *Tann v. United States*, 127 A.3d 400, 424 (D.C. 2015) (quoting *Castillo-Campos v. United States*, 987 A.2d 476, 483 (D.C. 2010)).

Substantial evidence at trial showed that there was an agreement to assault the complainant, Henderson, if not to also steal from him. Frazier testified that Ahmed called appellant asking him to do something for her and requested he "bring his friend." Frazier perceived this to be asking him to bring a knife or a gun. When in the car on the way to Henderson's home, Ahmed explained to appellant that Henderson called the police on her and her boyfriend and would not allow her to get her things. Although violence was not explicitly discussed, Frazier interpreted appellant's role was to be the "strong arm."

Appellant followed through on Ahmed's request to bring a gun, as he had a Glock handgun in his hands prior to entry—of which at least Frazier was aware—thereby supporting an inference that there was an agreement to assault Henderson. Appellant's comment to Ahmed, "Let me shoot this n***, Sis," and Ahmed's response, "beat him up but don't shoot him," also bolstered the inference that there was an agreement to assault complainant. Frazier's actions also support a conclusion that some sort of agreement existed; when Henderson opened the door, she immediately took Henderson's phones from him and called him a snitch. This evidence, viewed in the light most favorable to the government, is sufficient to support a conviction for conspiracy to commit burglary.

The evidence was likewise sufficient to support a burglary conviction. The trial court instructed the jury that it had to find that appellant "intended to assault or steal" at the time of entry in order to convict appellant of burglary.[3] Here, the

---

[3] However, it does not appear that the trial court either was requested to instruct the jury or in fact instructed the jury that it must be unanimous as to *which* crime or crimes appellant specifically intended to commit at the time of the burglary, *i.e.*, assault, theft, or assault and theft. Thus, there is an apparent unanimity problem with the trial court's instructions that the jury must find that appellant had an intent to assault *or* steal without an accompanying instruction that the jury must be unanimous as to which crime appellant intended to commit. However, appellant has not raised an issue as to the lack of jury unanimity, nor does it appear that either at trial or on appeal he made any such objection. Consequently, appellant never preserved any objection he might have had for

(continued…)

evidence supported appellant's intent to assault and to steal, and his co-conspirators Kimbrugh's and Frazier's intent to steal, at the time of entry. Immediately upon entering the apartment, appellant restrained Henderson with force and struck him, while the others began to remove property from the apartment, and appellant ordered Frazier to "take everything else out of [Henderson's] pocket." This sequence of events, which occurred immediately after entry, supports a finding that the intent to assault and to steal also existed moments before, at the time of entry. *See Lee v. United States*, 699 A.2d 373, 384 (D.C. 1997) (finding sufficient evidence of intent to steal and to assault upon entry because defendants "immediately exhibited aggressive behavior," restrained the complainants, and began to steal from them shortly after entering the home).

Based on these facts, a rational jury could have found the essential elements of conspiracy to commit burglary and burglary.

**B. Claim of Right Jury Instruction**

---

(…continued)
appeal, and we merely note the apparent instructional problem. *Cf. Marshall v. United States*, 623 A.2d 551, 565 n.6 (D.C. 1992) (Ferren, J., dissenting in part and concurring in result only).

Appellant also argues that the trial court erred in denying his request at trial for a claim of right jury instruction.[4] The model claim of right jury instruction in the District of Columbia reads:

> An element of the offense of robbery is that the defendant had the specific intent to steal. You have heard evidence that [name of defendant] believed that s/he had a right to take the property. If a person takes the property of another in the good faith belief that s/he has a right to take it, the specific intent element of robbery is lacking. It does not matter whether the defendant actually had a right to the property. It is only necessary that s/he believed in good faith that s/he was entitled to or could legally take the property.
>
> The government must prove beyond a reasonable doubt that [name of defendant] did not believe in good faith that s/he had a right to take the property. If it does not do so, you must find him/her not guilty.

Criminal Jury Instructions for the District of Columbia, No. 9.521 (17th ed. 2019).

Appellant requested that this instruction be revised to state:

> [You] heard evidence that Zakiya Ahmed believed that she had a right to take the property and that Mr. Wilson

---

[4] Appellant does not specify for which offenses he believes a claim of right instruction was warranted. At trial, he requested it for the kidnapping, burglary, and robbery charges, but not for the conspiracy charge. Because he was acquitted on the robbery count, we need not address whether the instruction should have been given as to that charge. With respect to the kidnapping charge, that offense does not require an accompanying intent to steal or assault, but only "to hold or detain." This leaves us to address whether the claim of right instruction should have been given as to the burglary charge.

> was assisting her in defense of that right. . . . It does not matter whether Ms. Ahmed actually had a right to the property. It is only necessary that Mr. Wilson believed in good faith she was entitled to or could legally take the property. The Government must prove beyond a reasonable doubt that Mr. Wilson did not believe Ms. Ahmed had a right to the property.

The trial court denied appellant's request.

The trial court did not clearly explain its decision in denying the claim of right instruction; it seemed to conflate the defense's request for a claim of right jury instruction with the defense's request for a defense of property jury instruction, denying both because the defendant was not entitled to "step into [Ahmed's] shoes" to defend or retrieve her property by force.

"Generally, [w]hen a defendant requests an instruction on a theory of the case that negates his guilt of the crime charged, and that instruction is supported by any evidence, however weak, an instruction stating the substance of the defendant's theory must be given." *Higgenbottom v. United States*, 923 A.2d 891, 899 (D.C. 2007) (quoting *Gray v. United States*, 549 A.2d 347, 349 (D.C. 1988)). "Although the instruction need not be given exactly as suggested, the failure to give such an instruction where some evidence supports it is reversible error." *Frost v. United States*, 618 A.2d 653, 662 n.19 (D.C. 1992). However, "[t]he trial

judge may properly refuse to give an instruction where no factual or legal basis for it exists." *Id.*

In *Richardson v. United States*, 403 F.2d 574, 576, (D.C. Cir. 1968), the court set out the claim of right defense for this jurisdiction.[5] A defendant cannot be guilty of crimes for which a specific intent to steal is an element "unless he has the specific intent to take the property of another." *Id.* at 575. Therefore, a defendant is entitled to a claim of right defense if s/he has a good faith belief that s/he is legally entitled to the property s/he is charged with taking. *Id.*[6]

In this case, appellant asserts that there was enough evidence to support a claim of right defense because he only intended to help Ahmed recover her own property and therefore lacked an intent to take property to which he and Ahmed were not entitled. This court has not considered whether a defendant can assert a claim of right defense on behalf of a third party who has authorized the defendant

---

[5] This precedent is binding in this jurisdiction. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).

[6] The comment to the Criminal Jury Instructions for the District of Columbia, No. 9.521, indicates that the claim of right jury instruction can be used for property crimes other than robbery that require specific intent.

to reclaim property. However, assuming the legal viability of such a claim, it is doubtful in this case whether this court need reach that question because a defendant cannot assert the claim of right defense when he takes property that he did not in good faith believe belonged to him.[7]

In this case, the evidence showed that Frazier and Kimbrugh took more than just Ahmed's property from Henderson's apartment. Frazier took two phones from Henderson right after appellant, Kimbrugh, and Frazier burst into his apartment; only one phone belonged to Ahmed. They also took Henderson's chain, ring, and money from his pocket, all of his food, and his boots from his room. Because they took items that they did not in good faith believe belonged to them or Ahmed, there was no evidence to support appellant's claim that he *only* intended to help Ahmed recover her own property.

However, assuming without deciding that the trial court erred in failing to give a claim of right instruction for the burglary charge, any error was harmless.

---

[7] *See, e.g., Smith v. United States*, 330 A.2d 519, 521 (D.C. 1974) (a defendant could not assert the claim of right defense when the defendant attempted to retrieve a drug debt of $30 and instead took $500); *Robertson v. United States*, 429 A.2d 192, 195-96 (D.C. 1981) (affirming the denial of a claim of right instruction when the defendant embezzled $601.99 from his employer but was only entitled to $200).

"To find an instructional error harmless, 'we must be satisfied with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *Higgenbottom*, 923 A.2d at 899 (quoting *Brooks v. United States*, , 1101-02 (D.C. 1991)). "An error will be harmless, and will not be reversible, when the instructions the court actually gave 'adequately presented the defense theory' and 'properly inform[ed] the jury of the applicable legal principles involved,' despite the erroneous omission." *Id.* (quoting *Gray v. United States*, 549 A.2d 347, 351 (D.C. 1988) and *Stewart v. United States*, 687 A.2d 576, 578 (D.C. 1996)).

Here, the burglary charge was predicated on an intent to assault or steal. *See supra* note 3. The trial court instructed the jury that it had to find that appellant "intended to assault or steal" at the time of entry in order to convict him of burglary. Setting aside intent to steal, there was substantial evidence of appellant's intent to assault. Prior to the incident, Ahmed texted Henderson asking whether she should send "Rochelle or India or my Protector!!! Or are we gonna get it right the first time?" By "protector," Henderson interpreted Ahmed as meaning someone who would retrieve her property by force or "any means necessary." Frazier said on the way to Henderson's apartment that appellant and Ahmed did not discuss violence, but she understood appellant's role was to be the strong arm. Prior to

entering the apartment, Frazier saw that appellant was holding a black gun the size of a "Glock." Frazier and Henderson testified appellant pistol-whipped Henderson in the face, made him get on the ground, and hit him. Henderson also testified that appellant stomped on his face and covered his face with a cloth and said, "[Y]ou f****t motherfucker, I should shoot you." Frazier testified that appellant stated, "Let me shoot this n***, Sis," to which Ahmed replied, "Beat him up, but don't shoot him." In both 911 calls, Henderson stated that he had just been pistol-whipped. Thus, there is ample evidence that appellant had the intent to assault upon entering the apartment, unrelated to any purported claim of right.

Moreover, the judge otherwise properly advised the jury of the applicable legal principles and adequately presented the defense theory. *Higgenbottom*, 923 A.2d at 899. Although he did not give the claim of right jury instruction, he summarized the defense's theory, using the language requested by the defense, stating:

> It is the defense's theory in this case that Mr. Wilson was asked to assist in obtaining Ms. Ahmed's property and that he did so under a bona fide belief that the property taken was hers. It is the defense theory that he did not enter [the apartment] by force, nor did he enter with the intent to rob, assault, or commit any other crime against . . . Henderson; nor did he participate in the planning of, or agreement [with] any such conduct.

Because the trial judge adequately presented the defense's theory that appellant did not believe he was doing anything wrong in assisting Ahmed procure her property from appellant, and because there was ample evidence of appellant's intent to assault to which a claim of right defense would not apply, we are satisfied that the judgment was not substantially swayed by any error in the jury instructions and that any such error was harmless. *See id.*

## C. Evidentiary Claims

### 1. Prior Consistent Statements

Appellant argues that the trial court abused its discretion by admitting Henderson's statements he made to the police on January 5, 2017, because they were made when Henderson had a motive to fabricate.[8] At trial, appellant's counsel cross examined Henderson about his cooperation with the government

---

[8] Appellee, relying on *Bardoff v. United States*, 628 A.2d 86, 90 n.8 (D.C. 1993), argues that appellant abandoned this claim because appellant did not identify any specific statements or their content in challenging the prior consistent statements. *Bardoff* and D.C. App. R. 28(a)(10)(A) require that a party's brief contain "contentions of the appellant with respect to the issues presented, and the reasons therefore, with citations to the authorities, statutes and parts of the record relied upon." We do not believe this claim is abandoned. Appellant adequately detailed these statements in his statement of facts and identified the numbers of the exhibits that were shown to the jury.

both in the drug dealing case involving Ahmed and Fanbone and in a drug conspiracy case from 1994. The defense's theory in eliciting this testimony was that Henderson "ha[d a] motive to make himself a victim here rather than to be charged as a co-conspirator in this drug conspiracy," as he had done in the past.

Appellant's counsel also questioned Henderson extensively on cross-examination about his conversations with the MPD officers. The defense asked him questions such as: (1) "and you did not say anything to Officer Reaves about any gay slur being said to you. Isn't that correct?"; (2) "did you tell Detective Glynn that when the four individuals led by Larry came into your apartment, Steve [appellant] began striking you in the face with a handgun, causing two lacerations on your forehead and right eyelid?"; and (3) "Did you tell him that . . . all four were removing items from the apartment?" Henderson agreed that he said some of these things, denied saying some of them, and did not recall whether he said others.

On Henderson's redirect examination, the government played five video clips from Officer Reaves' body camera footage on January 5, 2017. The clips included conversations between Officer Reaves and Henderson in the ambulance, and among Henderson, Officer Reaves, and Officer Glynn at the hospital, discussing the police raid and the incident involving appellant, Frazier, Ahmed,

and Kimbrugh. The government introduced this evidence to "rehabilitate" Henderson with respect to whether he was a cooperator and to rebut "the implication about all the little things he did or did not say." Appellant's trial counsel objected to the admission of these statements because they were made after the motive to fabricate regarding the drug-dealing case arose, which was when Henderson's family contacted Sergeant Sloan and Henderson began to cooperate with the police, around Thanksgiving of the previous year. The court admitted the statements over appellant counsel's objection.

This court reviews "the trial court's evidentiary rulings for abuse of discretion, recognizing that it is necessarily such an abuse for the trial court to employ incorrect legal standards." *In re C.A*, 186 A.3d 118, 121 (D.C. 2018). Prior consistent statements are generally inadmissible because "'mere repetition does not imply veracity and . . . once an inconsistency in [a] statement is shown, evidence of additional consistent statements does not remove the inconsistencies.'" *Mason v. United States*, 53 A.3d 1084, 1090 (D.C. 2012) (quoting *Brown v. United States*, 881 A.2d 586, 599 (D.C. 2005)). However, there are a number of exceptions to this general rule that have been codified in this jurisdiction. *Id.* D.C. Code § 14-102(b)(2) provides that

A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is . . . (2) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive.[9]

This court has recognized an additional exception: a prior consistent statement can be admitted where "the witness' testimony has been impeached by a portion of a statement which also contains relevant information that could be used to meet the force of the impeachment." *Musgrove v. United States*, 441 A.2d 980, 985 (D.C. 1982) (quoting *Rease v. United States*, 403 A.2d 322, 328 n.7 (D.C. 1979)). The purpose of this exception is to "assist a determination as to just how serious the inconsistencies might be." *Coltrane v. United States*, 418 F.2d 1131, 1140 (D.C. Cir. 1969).

Appellant argues that the statements Henderson made to the officers in the ambulance and the hospital were made after his motive to fabricate originated, in violation of D.C. Code § 14-102(b)(2), and are therefore inadmissible prior consistent statements. However, although Henderson had previously given

---

[9] *See* Fed. R. Evid. 801(d)(1)(B); BRIAN T. FITZPATRICK, *ET AL*., THE LAW OF EVIDENCE IN THE DISTRICT OF COLUMBIA § 801.01(5)(a), (b), pp. 8-62–8-80, Editorial Commentary and Case Annotations (6th ed. 2020).

information to Sergeant Sloan about the drug trade out of his apartment and agreed to assist the government with regard to the drug dealing case, much of the conversation in the clips was about events that transpired on the night of the burglary in which Henderson was the victim. Any motive to lie that Henderson had about the drug-dealing was not related to events associated with the burglary. Henderson had no reason to be concerned about being implicated in the burglary-related events where he was the victim. As the government argued at trial and the trial court agreed, any motive to fabricate with regard to the burglary would have occurred at the time Henderson was testifying at trial or after he agreed to testify. Any motive to fabricate about the burglary would not have existed at the time of his first report to police. Consequently, these statements fell under the exception in D.C. Code § 14-102(b)(2).

These statements also were admissible under the second exception. Appellant's trial counsel questioned Henderson as to what he told Officers Reaves and Glynn on the night of the incident, suggesting inconsistencies between his testimony at trial and the earlier statements he made regarding whether he was struck with a gun and whether he was called a homophobic slur, among other things. By asking these questions, defense trial counsel opened the door to clarification as to what Henderson told the officers in the ambulance and at the

hospital. Therefore, the government could properly introduce Henderson's statements to help the jury determine whether—and to what extent—the statements were inconsistent. *See Coltrane*, 418 F.2d at 1140.

Finally, if there was error in the admission of these statements, any error was harmless. This court will affirm a non-constitutional error if "we can say, 'with fair assurance, after pondering all that happened without stripping the [allegedly] erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *Clark v. United States*, 639 A.2d 76, 84 (D.C. 1994) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). Here, the statements at issue were not admitted for their truth, but rather because Henderson's credibility with respect to the statements had been called into question. Indeed, the trial judge instructed the jury that if they found the statements were consistent with Henderson's statements at trial, the jury could consider the consistency *in judging the credibility of Henderson, not for the truth of the statements*.[10] Consequently, the trial judge did not abuse his discretion in admitting these statements, and we

---

[10] Not only were the statements in issue not admitted for the truth but for the jury to assess Henderson's credibility, but his statements on the video were statements that the jury had previously heard, first through his own testimony and then through Frazier's testimony recounting the night's events. Henderson had also stated in his two 911 calls, both of which were admitted into evidence, that he had been pistol-whipped.

are satisfied that their admission in evidence did not substantially sway the judgment.

## 2. Ahmed's Texts

Appellant also claims the trial court abused its discretion in admitting a December 17, 2016, text from Ahmed to Henderson. At trial, the government devoted a significant amount of time presenting evidence to develop the context for the conspiracy between appellant and the other alleged co-conspirators, both through witness testimony and documentary evidence. The government elicited testimony from Henderson about the nature of his relationship with Ahmed leading up to the January 5, 2017, incident. Henderson stated that in December 2016, Ahmed had "started to get more aggressive and more demanding" in response to Henderson's request that she leave his apartment, and he said that "it just became a real distorted relationship after that."

It was at that point that the government introduced a text message from Ahmed to Henderson on December 17, 2016. The text message read:

> U got shit f****d up "gangsta" just cuz i dont jump when
> u say jump don't mean I dont respect u! What I dont
> respect is bullshit and demands!! U cant demand

anything from me! Nothing!! UND. OVERSTAND me??
Is Larry urhearts desire? He is cool! Respectful, chill,
conversationalist, etc..etc.. by the way… im the
"gangsta" in this family!!!!!

Before trial, appellant objected to the admission of these statements, arguing that they could not come in as co-conspirator's statements because they were made weeks prior to the formation of the alleged conspiracy and the texts were not relevant. The government responded that the texts were not being offered for their truth but for context regarding Ahmed's animosity towards Henderson. The trial court denied appellant's motion to exclude the texts, recognizing that evidence of a conspiracy usually is found after the conspiracy has formed, but noting that "in this case the contextual corroboration is in the events that occur prior to the formation of the conspiracy."

"A trial court has broad discretion to make evidentiary rulings because of its familiarity with the details of the case and expertise in evidentiary matters, and we review that ruling for abuse of discretion." *(Troy) Richardson v. United States*, 98 A.3d 178, 186 (D.C. 2014). In *(William) Johnson v. United States*, 683 A.2d 1087, 1099-1100 (D.C. 1996) (en banc), this court adopted Federal Rule 403 which provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair

prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Rule 403 "essentially *presumes* the admissibility of relevant evidence,[11] and "[t]he trial court enjoys particularly broad discretion in determining the relevance of a piece of evidence because the inquiry is fact-specific and proceeds under a flexible standard." *(Troy) Richardson*, 98 A.3d at 186. Evidence is relevant if it "tend[s] to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence." *In re L.C.*, 92 A.3d 290, 297 (D.C. 2014). "The test for relevance is not a particularly stringent one." *Street v. United States*, 602 A.2d 141, 143 (D.C. 1992).

The trial court did not abuse its discretion in admitting Ahmed's December 17th text to Henderson. The prosecution requested that the statements come in for context, not for the truth of the matter asserted. Ahmed's text was relevant in that it gave context to the relationship between Ahmed and Henderson, which was relevant to the government's theory that Ahmed's and Henderson's relationship deteriorated to the point that, on January 5, 2017, Ahmed sought revenge and violence against Henderson, not just to retrieve her belongings. The prosecution

---

[11] *See* FITZPATRICK, *ET AL.*, *supra* note 9, § 403.01(2), Editorial Commentary, p. 4-144.

discussed the formation and deterioration of their relationship in their opening statements and throughout trial. The prosecution portrayed Ahmed as manipulative of Henderson, while the defense portrayed Henderson as the manipulator. The text supported the government's theory that Ahmed was trying to control Henderson and to continue selling drugs out of his apartment and that she was aggressive when Henderson was not heeding her commands.

Furthermore, contrary to appellant's argument on appeal, the text was not unfairly prejudicial to him. Although the text used the word "gangsta," the purpose of introducing the text was to show Ahmed's attempt to control Henderson and her animosity towards him, not for the truth of the statements themselves or to show that Ahmed was literally a "gangsta." Additionally, although appellant was Ahmed's coconspirator, the text does not indicate that he was a "gangsta" or that he was involved in the drug dealing that occurred out of Henderson's apartment. The trial judge did not abuse his discretion in admitting the text message.

Finally, if any error occurred in admitting these statements, it was harmless. There was ample evidence in the record of Ahmed's animosity towards Henderson. Ahmed texted Henderson asking whether she should send "Rochelle or India or my Protector!!! Or are we gonna get it right the first time?" Henderson interpreted

"Protector" as meaning that Ahmed was referring to someone who would retrieve her property by force or "any means necessary." When Ahmed called appellant, she told him that she needed him to do something for her and directed appellant to meet her on Taylor Street and "to bring his friend," meaning a knife or a gun. When Ahmed arrived at Henderson's apartment while the incident was ongoing, she whispered to Henderson, "[Y]ou thought you got away with it, you thought I wasn't gonna get my stuff," and, "[Y]ou got my nephew locked up and you got my friend locked up." Ahmed also told appellant to "[b]eat [Henderson] up, but don't shoot him." Although the text was helpful in giving context to Ahmed and Henderson's relationship and Ahmed's animosity towards Henderson, it was not a crucial piece of evidence in establishing the conspiracy.

### D. Merger

Lastly, appellant argues his unlawful entry conviction should have merged with his burglary conviction. Appellant asks that if his burglary conviction is not vacated, the unlawful entry conviction be vacated. The government does not oppose this request.

The jury found appellant guilty of both first degree burglary and unlawful entry. The trial judge stated at sentencing that he believed the unlawful entry conviction should merge with the burglary conviction. The trial court imposed a sentence with the expectation that the unlawful entry conviction would merge with the burglary conviction on appeal, if the burglary conviction was not reversed. Because we are not reversing the burglary conviction, the unlawful entry conviction will be vacated. Appellant's remaining convictions are affirmed.

## III. Conclusion

For the foregoing reasons, the trial court's judgment is affirmed in part and vacated in part.

*So ordered.*